W. Willard WIRTZ, Secretary of Labor,
United States Department of Labor,
Plaintiff,

v.

**WELFARE FINANCE CORPORATION,**
a corporation, Defendant.

Civ. A. No. 838–F.

United States District Court
N. D. West Virginia,
Fairmont Division.

Jan. 7, 1967.

Marne S. Matherne, Nashville, Tenn. (Charles Donahue, Sol., Dept. of Labor, Jeter S. Ray, Regional Atty., Dept. of Labor, and John H. Kamlowsky, U. S. Atty., on brief), for plaintiff.

Herschel Rose, Fairmont, W. Va., Harry M. Wasserman, Cincinnati, Ohio, for defendant.

CHRISTIE, District Judge.

The Secretary of Labor has instituted this civil action against the defendant, Welfare Finance Corporation, to restrain further alleged violations of the minimum wage, overtime compensation and record keeping provisions of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. §§ 201–219 (hereinafter called the Act), and to recover for certain employees any unpaid minimum wage and overtime compensation due them under the Act.

The original complaint asserted traditional coverage as to the employees in question on the basis of their having individually engaged in commerce or in the production of goods for commerce, but leave was granted the Secretary to file an amended complaint setting up the "enterprise" theory, as defined in Sections 3(r),[1] 29 U.S.C.A. § 203(r) and

---

1. Section 3(r) provides: " 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor: Provided, That, within the meaning of this subsection, a retail or service establishment which is under independent ownership shall not be deemed to be so operated or controlled as to be other than a separate and distinct enterprise by reason of any arrangement, which includes, but is not necessarily limited to, an agreement (1) that it will sell, or sell only, certain goods specified by a particular manufacturer, distributor, or advertiser, or (2) that it will join with other such establishments in the same industry for the purpose of collective purchasing, or (3) that it will have the exclusive right to sell the goods or use the brand name of a manufacturer, distributor, or advertiser within a specified area, or by reason of the fact that it occupies premises leased to it by a person who also leases premises to other retail or service establishments."

3(s) (3),[2] 29 U.S.C.A. § 203(s) (3) of the Act.

## GENERAL OPERATION

The defendant is an Ohio corporation with home offices in Cincinnati, Ohio, and is engaged in the installment loan business through a total of 86 branch offices in the states of Ohio, Indiana, Kentucky, Georgia, Illinois and West Virginia. The alleged violations are said to have occurred in the Clarksburg, Weston, Philippi and Grafton, West Virginia branches. No evidence concerning any employee at the Weston branch was introduced at this trial.

During the period of the alleged violations, defendant employed approximately 600 employees, about 77 of whom worked at the home office. The method of operation is highly centralized, the home office furnishing printed forms for records and reports, some of which reports being transmitted daily and some monthly to the home office. The home office also exercises auditing, bookkeeping and payroll supervision over the various branches and from time to time sends operating memos to the various branches for use by the personnel. However, the individual borrower deals exclusively with the local office personnel.

None of the branches in question is shown to have made loans to any persons residing outside the state of West Virginia, nor has any employee in question traveled outside the state of West Virginia in the course of his or her employment. The Clarksburg office manager did state that as a matter of accommodation a local office would accept payment from an individual having a loan at one of the company's other branches or from a person having a loan with another finance company. It was also established that when a customer of one office moved to another state in which defendant had a branch office, a transfer of the account would take place, with the original lending office being paid off in full by the assuming office, although such instances appear to be infrequent.

## ENTERPRISE COVERAGE

Defendant has stipulated that during the period in question its annual dollar volume of business was in excess of $1,000,000.00, and while it does not appear that loans as such would fall within the definition of sales contained in Section 3(k),[3] 29 U.S.C.A. § 203(k), of the Act, the legislative history of the 1961 amendments is helpful in showing a congressional intention to make the coverage of Section 3(s) (3) dependent upon the size of the business rather than a narrow concept of selling.

Senate Report No. 145, 87 Cong. 1st Sess. (1961), U.S. Code Congressional and Administrative News (1961), page 1624, in part is as follows: " * * * The million dollar test is an economic test. * * * It is a way of saying that anyone who is operating a business of that size in commerce can afford to pay his employees the minimum wage under this law." Of even more significance is a statement in the Senate Report at page 1650 concerning what was to become Section 3(s) (3) of the Act,

"The purpose of this provision is to eliminate fragmentation of coverage in the establishments of these large enterprises and prevent continuance of a situation in which some of the employees in such an establishment have the protection of the act while others who work side by side with them do

2. Section 3(s) provides: " 'Enterprise engaged in commerce or in the production of goods for commerce' means any of the following in the acivities of which employees are so engaged, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person:

       *     *     *     *     *

    (3) any establishment of any such enterprise, except establishments and enter-

prises referred to in other paragraphs of this subsection, which has employees engaged in commerce or in the production of goods for commerce if the annual gross volume of sales of such enterprise is not less than $1,000,000."

3. Section 3(k) provides: " 'Sales' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."

not. This provision would extend, to employees and employers in large enterprises where present coverage provisions apply, the same uniformity of coverage that is provided by the bill for large enterprises in which the employees are excluded from present coverage.

"This section would provide minimum wage and overtime protection under the act for approximately 100,000 additional employees in such enterprises as wholesale trade, finance, insurance, real estate, transportation, communications, and public utilities, and business, accounting, and similar services."

This indicates a clear intention to include businesses of defendant's nature within the ambit of these new provisions and a court must give them due consideration in an application of the law.

We accordingly conclude that, based upon the agreed stipulations regarding the duties of the branch office manager and the cashier-stenographer as well as the testimony of employees in these two categories, their activities are such as to bring each branch office outside the state of Ohio within the Act's enterprise coverage, thereby subjecting the branch office employees of such branch office, though not actually engaged in commerce or the production of goods for commerce under traditional coverage, to the Act's enterprise coverage requirements. Wirtz v. Wardlaw, 339 F. 2d 785 (4th Cir. 1964).

### TRADITIONAL COVERAGE

Whether or not an employee is subject to traditional coverage under the Act is dependent upon his individual activities not the nature of the employer's business, Overstreet v. North Shore Corporation, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656, and consequently each of the three classes of employees to which vio-

lations are alleged to have occurred will be treated separately. However, we deem it advisable to make certain general observations concerning the decided split of authority in the area of the multi-branch consumer finance industry.

In Mitchell v. Household Finance Corp., 208 F.2d 667 (3rd Cir. 1953), it was concluded that employees of a local branch of a small loan company, with duties similar to defendant's employees, were not within the purview of the Act, notwithstanding the fact that the employee's business was interstate and the employees activities were necessary to such business. On the other hand, since this decision three Circuit Courts of Appeals have had cases involving small loan companies and in each instance they have declined to follow *Household Finance* rationale. Two of these cases, Aetna Finance Co. v. Mitchell, 247 F.2d 190 (1st Cir. 1957) and Mitchell v. Kentucky Finance Co., 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815, are clearly distinguishable from the instant case, as well as *Household Finance,* supra; however, the most recent decision in this area, Beneficial Finance Co. of Wis. v. Wirtz, 346 F.2d 340 (7th Cir. 1965), is very near in point. Notwithstanding Beneficial's considerably larger operation and the fact that it offers its customers a so called "Nationwide Cash Credit Card" that allows an established customer to obtain a loan at Beneficial offices in other states, the actual day to day operation and duties of branch office employees are quite similar to those of Welfare Finance Corp. In refusing to follow *Household Finance* reasoning, the Court in Beneficial Finance, supra, 346 F.2d page 344, stated that under the standards set forth in Mitchell v. C. W. Vollmer & Co., Inc., 349 U.S. 427, 429,[4] 75 S.Ct. 860, 862, 99 L.Ed. 1196.

" * * * (T)here is no question but that Beneficial Finance Company

---

4. "The question whether an employee is engaged 'in commerce' within the meaning of the present Act is determined by practical considerations, not technical conceptions. * * * The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity."

and its subsidiaries, including 152 Wisconsin-Beneficial, were engaged in interstate commerce. Obviously, 152 Wisconsin-Beneficial (as well as other subsidiaries) was a participant in such engagement because of the services rendered by its employees. Its activities cannot be isolated on the premise that it is a local activity because (applying the Vollmer test) its work is so directly and vitally related to the functioning of an instrumentality of interstate commerce as to be for all practical purposes a part of it."

■ While recognizing the broadness of the *Vollmer* test and the fact that the Act is remedial in nature, we cannot be oblivious to the Court's observations in Mitchell v. H. B. Zachry Co., 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753, regarding the limitations in the Act itself, 29 U.S.C.A. § 203(j), as to the necessity of an activity being directly essential to the production of goods for commerce or on the actual production of goods for commerce in order to subject an individual employee to coverage. Considering this in light of an apparent congressional intent to extend the Act's coverage, by use of the enterprise concept, to employees in the finance industry, we decline to hold employees of a branch office of a small loan company which is admittedly engaged in interstate commerce subject to traditional coverage on no other ground than that the work performed by individual employees is necessary. This can be said of any employee regarding his employer's end product or overall operation in the successful conduct of a business. The correctness of this determination in the present situation is reinforced by plaintiff's statement concerning the submission of this matter on the enterprise concept.

## INDIVIDUAL EMPLOYEE DUTIES AND ALLEGED VIOLATIONS

■ (A) *Cashier-Stenographer:* As already indicated, the duties of defendant's cashier-stenographer in signing all checks on the branch office accounts, typing and making up reports to be mailed and mailing them to the home office, collecting payments on loans which are later returned to the home office as return of working capital, taking applications for loans on forms furnished by the home office which include, if the customer desires, life insurance by means of a presigned insurance policy written by an out-of-state company, constitutes engaging in commerce within the meaning of the Act. Wirtz v. Wardlaw, supra.

■ The only alleged violation as to this class of employees concerns Mrs. Jean Calvert, who was employed for about six months at defendant's Philippi, West Virginia office. She testified that at the very most her unpaid overtime would not have exceeded one-half hour per week and that it would have resulted from a customer coming in near closing time, thus necessitating her remaining in the office until the business could be transacted. Mrs. Calvert also testified that during a part of her employment she was not required to work Wednesday afternoons so that in those weeks she was not scheduled to work a full forty hours. No corroborating evidence was introduced concerning this alleged violation and in view of the nature of office work where coffee breaks and extended lunch hours are the rule rather than the exception, we are of the opinion that the burden of establishing a violation as to Mrs. Calvert has not been sufficiently shown.

(B) *Outside Representatives:* Whether defendant's outside representatives, whose primary duties were to solicit and collect delinquent accounts, which in this instance took place solely within West Virginia, are subject to traditional coverage is open to considerably more question than the case of the cashier-stenographer. To profitably operate the business it is necessary, of course, that the delinquent accounts be collected. The funds thus collected eventually move in commerce. However, while this activity arguably falls within the *Vollmer* test, when consideration is given to the representatives being one step removed from the local offices' interstate activities, and believing the congressional intent was

meant to extend coverage for this type situation on the basis of a business' size, regardless of the individual employee's duties, under the evidence adduced in this case, we are led to apply enterprise coverage to the outside representatives in determining if there were violations as alleged.

■ Though the testimony is conflicting as to whether each Saturday or Wednesday afternoon was worked, it is clear the outside representatives' time cards are not reflective of actual hours worked. In Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515, the Court observed that, while an employee has the burden of proving that he performed work for which he was not properly compensated, the public policy which the Act embodied militated against making that burden an impossible hurdle. The Court stated,

"In such a situation (where the employer has failed to keep proper records and the employee cannot offer convincing substitutes) we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate. * * *

"The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of § 11(c) of the Act."

In Caserta v. Home Lines Agency, Inc., 273 F.2d 943, 946 (2d Cir. 1959), it was observed that,

"Appellant's contentions that plaintiff is precluded from challenging his own time sheets by estoppel and the parol evidence rule are inconsistent with both the language and the policy of the Fair Labor Standards Act.

" * * * The obligation is the employer's and it is absolute. He cannot discharge it by attempting to transfer his statutory burdens of accurate record keeping, * * * *."

Nor is the fact that an employee's testimony is vague and indefinite insufficient to show an alleged violation of the Act. Goldberg v. Cockrell, 303 F.2d 811 (5th Cir. 1962).

■ Defendant endeavored to show the inexactness of the former employees' overtime estimates and introduced the testimony of Mr. Donald G. Dragoo, defendant's assistant operations supervisor and assistant secretary, and one time supervisor over the Grafton and Philippi offices, who stated that he had no knowledge of uncompensated overtime having been worked at the offices in question and that it was the Company's policy to grant compensable time off during any week in which an employee worked longer than scheduled on a particular day. This is insufficient to meet the employer's burden of showing the precise amount of work performed. Wirtz v. Durham Sandwich Company, 367 F.2d 810 (4th Cir. 1966).

Testimony was introduced concerning alleged violations regarding four outside representatives at defendant's Grafton and Philippi offices, viz: Danny Miklich, Ronald Nindle, Ronald Poling and Ralph Mayers. Three of these, Nindle, Poling and Mayers, claimed that it had been necessary to work two or three evenings per week after regular office hours attempting to collect delinquent accounts they had been unable to contact during regular working hours. They insisted that because of this time they would have worked an average of 50 hours per week. The testimony of the fourth, Miklich, who was employed approximately one month, is so much at variance with the other evidence, with the exception of the total

average weekly hours of overtime claimed, as to cast serious doubt upon its probative value.

■ While there is some question as to whether certain Saturday or Wednesday afternoons were worked, under the aforementioned standards, the evidence in this record is sufficient for this Court, as a matter of just and reasonable inference, to approximate the amount of unpaid overtime compensation due and owing employees Nindle, Poling and Mayers under the enterprise coverage concept. We find them to have worked an average of 50 hours per week in non-holiday weeks.

Nindle was employed from July 13, 1964 to December 19, 1964 (a period of 23 weeks less two holiday weeks). His salary was $225.00 per month or $51.92 per week. From July 13, 1964 to September 3, 1964, the minimum wage was $1.00 per hour with overtime for all hours in excess of 44 per week. For this seven and one-half weeks' period he is due $8.10 in unpaid overtime. From September 3, 1964 to December 19, 1964, the minimum wage was $1.15 per hour with overtime for all hours in excess of 42 per week. For this thirteen and one-half weeks' period he is due $137.43 or a total of $145.53.

Poling was employed from February 24, 1964 to January 23, 1965 (a period of 48 weeks, less two weeks at another job and five holiday weeks, or a total of 41 weeks). His salary was $225.00 per month or $51.92 per week. From February 24, 1964 to September 3, 1964, the minimum wage was $1.00 per hour with overtime for all hours in excess of 44 per week. For this twenty-four and one-half weeks' period he is due $26.46 in unpaid overtime. From September 3, 1964 to January 23, 1965, the minimum wage was $1.15 per hour with overtime for all hours in excess of 42 per week. For this sixteen and one-half weeks' period he is due $167.97, or a total of $194.-43 in unpaid overtime compensation.

Mayers was employed from October 26, 1964 to February 28, 1965 (a period of 18 weeks less four holiday weeks, or a total of 14 weeks). His salary was $225.00 per month or $51.92 per week. During this period, the minimum wage was $1.15 per hour with overtime for hours in excess of 42 per week. Mayers is due a total of $142.52 in unpaid overtime compensation for this fourteen weeks' period.

All of the foregoing determinations have been made in accordance with the Act's enterprise coverage requirements.

■ (C) *Janitors:* The Secretary contends that Arthur Carpenter, the janitor at the Clarksburg, West Virginia office, and Emma Jack, the janitress at the Philippi office, are employees within the meaning of the Act, while defendant contends they are independent contractors. The burden of showing the existence of the employer-employee relationship is upon the Secretary.

In determining the existence or nonexistence of an employee versus independent contractor relationship, the Supreme Court stated in United States v. Silk, 331 U.S. 704, 716, 67 S.Ct. 1463, 1469, 91 L. Ed. 1757 (1946) that, " * * * degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation are important for decision. No one is controlling nor is the list complete." It was recognized in McComb v. Homeworkers' Handicraft Cooperative, 176 F.2d 633 (4th Cir. 1949), that common law rules as to distinctions between servants and independent contractors throw little light on who is to be deemed an employee within the meaning of the Act. Likewise it was stated in Mitchell v. John R. Cowley & Bros., Inc., 292 F.2d 105 (5th Cir. 1961), that a written contract denominating a watchman an independent contractor rather than an employee did not make him such for purposes of the Act and that his actual status must be determined on the basis of economic reality rather than technical concepts.

■ Obviously the denomination is not determinative, but rather the actual factual situation applicable to the indi-

vidual in question. Bearing the foregoing rules in mind, the factual situations in the instant case are as follows:

Arthur Carpenter has been engaged since July 1962 in performing janitorial services at defendant's Clarksburg office. On or about July 23, 1962, Mr. Carpenter entered into an agreement with defendant whereby he was to perform as an "independent contractor" in furnishing janitor service in accordance with the Company's daily requirements for keeping its place of business neat and clean, for which he was to receive $15.00 per week. The agreement also provided that it was subject to amendment by mutual agreement and could be terminated on 5 days' notice by either party. This same understanding continues in effect.

For the past 10 years, Mr. Carpenter has also been employed as janitor and maintenance man for the First United Presbyterian Church in Clarksburg, West Virginia, and for the past year he has done janitorial work for the Midland Finance Company in Clarksburg. Prior to having accepted the janitorial job with defendant, he placed advertisements in a local newspaper holding himself out as being qualified for that type of work.

The defendant furnishes Mr. Carpenter with the necessary supplies to clean an office and exercises no supervision as to when or how the cleaning is to be done. For a part of the period involved in this action his twenty year old son aided him in the cleaning, although there is no contention on the part of the Secretary that the son was defendant's employee or that he is due wages under the Act. Mr. Carpenter's only contact with defendant regarding how the work is to be performed is an occasional note left by the office manager requesting something other than the usual cleaning to be done. The record indicates that upon doing this additional work he has received extra compensation. It is clear that defendant exercises a minimal amount of control as to how or when the office is to be cleaned other than the fact that it is to be performed after working hours. While the degree of skill required by work of this nature is not great, to accomplish it in a satisfactory manner requires some degree of ability, which Mr. Carpenter has obviously held himself out as possessing. The record also indicates (though it alone is not determinative) that at the time of entering into the agreement he considered himself an actual contractor as distinguished from an employee. Admittedly, a person with a fourth grade education is not likely to make the fine legal distinction existing in a court of law on this question, however, considering his having engaged in the odd job business wherein he would clearly have been a contractor, it tends to lend substantial credence to the conclusion that this agreement was more than a mere sham to take advantage of a workingman by making him a "paper" contractor while in actuality he remained an employee.

■ In the *Silk* case, supra, the Court indicated that no single factor was determinative. While granting that if used alone some of those tests would require a conclusion that Mr. Carpenter was an employee, in view of the entire nature of the relationship and based upon the evidence in this record, particularly in light of the various jobs he performed for other concerns during the period in question, we are led to the conclusion that a *bona fide* independent contractor relationship exists between the parties and that, consequently, no violation of the Act has occurred as to Mr. Carpenter.

■ The matter of Emma Jack is complicated by certain statements made at the supplemental hearing by plaintiff's attorney and wage hour investigator Clarke to the effect that Mrs. Jack would have been properly compensated under enterprise coverage. In its brief, defendant takes the position that these statements have the effect of a dismissal while plaintiff continues to allege violations under both enterprise and traditional coverage requirements. The mistake of plaintiff's counsel concerning the effect of the enterprise requirements on this employee did not amount to a formal dismissal. This Court is bound to take

judicial notice of the laws of the United States and their application. There being evidence as to both Mrs. Jack's hours of work and her duties, the question of whether or not violations have occurred as to her remains before the Court.

The agreement with Mrs. Jack which she signed on or about January 16, 1964 is still in effect and is similar to that with Mr. Carpenter. It provides that she is to receive $20.00 per month in $10.00 installments, to be paid on the 15th and 30th of each month. Defendant furnishes the usual office cleaning equipment with Mrs. Jack furnishing the necessary soaps and cleansers, etc., for which she is later reimbursed. The cleaning is performed three times a week and takes about one and one-half hours per day for two days and two or three hours on the third day, depending on whether she waxes the floors or washes the windows, these being done in alternate weeks. No control is exercised over the manner in which the work is to be performed other than to require that it be done outside office hours. On occasion, Mrs. Jack's husband has apparently helped her although no violations of the Act are alleged as to him. She has also been employed to do cleaning for approximately the past four years by the Style Shop, Clarksburg, West Virginia.

■ Although the amount of work involved in this particular situation, approximately 5½ hours per week, is rather small, this alone is not the determining factor, but like the others, must be given its due weight. It is recognized that Philippi, West Virginia is a small community in which a janitorial service is unlikely to be available and it is understandable that an employer would seek to secure the services of someone on a contractual basis to do this type of work rather than hire a part-time employee with the requisite additional expense, nevertheless, the fact that the work involved is minute and it would be cheaper for the employer to have it contracted does not prevent an application of the Act.

■ This situation is markedly different from that of Arthur Carpenter. While Mrs. Jack does have one other cleaning job, there is no record of her having consistently engaged in independent contractual relationships over a period of time with several establishments. Nor has she attempted to hold herself out as an applicant for cleaning service. When all the facts in the instant record are considered in light of the standards in the Silk case, supra, the relationship between defendant and Mrs. Jack was that of employer-employee.

We accordingly conclude that Mrs. Jack is subject to the Act's enterprise coverage provisions and that she failed to receive the required minimum wage thereunder. We find that during the period February 29, 1964 to June 14, 1965 (a period of 67 weeks), she received an average weekly wage of $4.61. During the period February 29, 1964 to September 3, 1964 (26½ weeks), the required enterprise coverage minimum wage was $1.00 per hour or $5.50 for 5½ hours of work. Therefore, she is entitled to an additional $.89 per week or $23.58 for the twenty-six and one-half weeks' period. From September 3, 1964 to June 14, 1965 (40½ weeks), the required minimum wage was $1.15 or $6.32 for 5½ hours' work. Hence, she is entitled to an additional $1.71 per week or $69.25 for the forty and one-half weeks' period, making a total of $92.83 in unpaid minimum wages due and owing her under the enterprise coverage provisions of the Act.

## CONCLUSION

■ The primary goal of this action has been to obtain injunctive relief against future infractions of the Act. It is well established that the granting of such a remedy rests largely within the Court's discretion, Beneficial Finance Co. of Wis. v. Wirtz, supra, and notwithstanding the record keeping, minimum wage and overtime violations disclosed by this record, the present situation does not warrant its issuance.

Although the more recent Circuit Court decisions have indicated a tendency to ap-

ply traditional coverage to small loan company branch offices, a split of authority between the circuits did exist when the alleged violations herein complained of occurred. We find no Fourth Circuit decision on the precise point. Thus it can hardly be said that the defendant was without some justification in asserting its contentions. Indeed, this record discloses confusion on the part of plaintiff's counsel in the matter. For during the period in issue (until the filing of the amended complaint setting up the enterprise theory) he apparently sought to apply traditional coverage to all defendant's employees.

■ Moreover, the violations regarding the outside representatives appear attributable to local manager zealousness rather than to company policy, and while this does not justify the transgressions, it is a factor to be considered in determining the propriety of granting the injunction sought. Likewise, while one janitor is determined to be an employee, the other is determined to be an independent contractor, as defendant contended throughout. When all these factors are considered, we believe defendant's disputation of coverage was in good faith and mitigates against the harshness of injunctive relief. Mitchell v. Hodges Contracting Co., 136 F.Supp. 854 (D.C.Ga.1955); Wirtz v. Edisto Farms Dairy, 242 F.Supp. 1, (D.C.S.C.1965).

Moreover, when this action was first brought and injunctive relief prayed for, the plaintiff's counsel, relying upon his field investigators' reports, foresaw a situation more grievous than what the ultimate proof showed. For example, the plaintiff originally claimed violations involving thirteen alleged employees aggregating under payments of over $2500.-00, yet at the final hearing his attorney conceded that violations had not been shown as to eight of them, leaving only five claims aggregating less than $700.00 by the Government's own calculations. Of these, we have determined that the proof sustains a violation as to three. We also find a violation as to one other, Mrs. Jack. Under such circumstances,

assuming that our findings are correct, an injunction appears ill-advised.

Consequently, while similar future violations will be inexcusable, the ends of justice and the purposes of the Act will best be served at this time by the prompt payment of the unpaid wages found due and the immediate institution by the defendant of a record keeping system which will accurately reflect in the future each employee's hours of work, in compliance with the provisions of the Fair Labor Standards Act and the regulations issued thereunder.

This Memorandum Opinion shall constitute Findings of Fact and Conclusions of Law required by Rule 52(a) and an appropriate order may be presented making this Memorandum Opinion a part of the record herein.