**Charles R. MEDNICK,**
**Plaintiff-Appellant,**

v.

**ALBERT ENTERPRISES, INC., and**
**Bal Harbour Towers, Inc.,**
**Defendants-Appellees.**

**No. 73–3781.**

United States Court of Appeals,
Fifth Circuit.

Feb. 13, 1975.

Gene J. Tischer, Miami, Fla., for plaintiff-appellant.

W. Reynolds Allen, Donald T. Ryce, Jr., Robert L. Norton, Coral Gables, Fla., for defendants-appellees.

Before THORNBERRY, GOLDBERG and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

This is a suit under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., by one claiming to be an employee, seeking to recover wages, overtime pay and liquidated damages.[1] The case was tried to the court, which found for the defendants on the sole ground that the plaintiff was not an employee but an independent contractor. Plaintiff appeals. The only issue to be reviewed is the finding that plaintiff was an independent contractor.

Plaintiff Mednick worked in Harbour House, the apartment house-hotel of the defendants, overseeing the operation of the cardrooms. These were rooms generally devoted to the playing of card games, such as bridge or gin rummy, on most afternoons and evenings. Mednick's principal obligation was to attend to the needs of the players. For the most part this consisted of supplying them with candy and fresh decks of playing cards, and occasionally of other amenities, such as ice, soft drinks, cigars and cigarettes, and sometimes other services, such as walking one regular patron back to her rooms. Mednick paid for the candy, cards, cigars and ice out of his own pocket, as was the practice for the person running the cardrooms. It was understood that his sole compensation would be the gratuities he received from the players. These apparently were fairly standardized—$1.00 for the use of a table by four patrons, which included a candy bar for each, another 75 cents or a dollar when he supplied a deck of cards. Some patrons were more generous, and five dollar tips were not uncommon, and even larger tips not unheard of. These rooms were put to other uses of a group nature, primarily bingo, movies, card parties and occasional business meetings, for which Mednick provided some services by way of preparing the rooms for these activities. The groups were largely composed of Harbour House residents and were subsi-

---

1. As provided in 29 U.S.C. §§ 206, 207 and 216(b).

dized by Harbour House. For these services, Mednick rendered monthly handwritten bills to the groups.

Other pertinent facts found by the trial court or that fairly appear undisputed in the record, are as follows: Harbour House paid no health insurance premiums for Mednick, nor did it give him paid vacation or sick leave as it did for conceded employees. Mednick paid his own social security and withholding taxes, and his federal income tax returns were filed on the form for self-employed taxpayers. Harbour House did not set hours for operation of the cardrooms, nor did it even require that Mednick be present. He hired and fired his own employees, about ten in all over a five year period, who would work in the cardrooms in his stead four or five times a week for half-day periods. He never had more than one or two such sub-employees working for him at a time, and he made no profit from them when he did, remitting to them exactly what he would have received had he himself done the work. Further Harbour House manager Taplin was involved in decisions to hire and fire; occasionally he told Mednick he did not approve of certain applicants, whom Mednick then did not hire, or certain employees, whom Mednick then fired. Whether Taplin's statements on such occasions are deemed requests or orders, it was clear that all parties understood that they would be complied with.

Mednick received no specific orders from Taplin about the services he performed in the cardrooms. But Taplin did give Mednick a variety of orders concerning the care of the facilities. Although the rooms were normally cleaned by full-time Harbour House janitorial staff, Taplin ordered Mednick to do cleaning jobs a number of times. Taplin usually provided Mednick with a uniform jacket bearing the Harbour House name. The cardrooms were furnished with Harbour House furniture. The rooms assigned to cardroom use were not fixed

by contract or agreement, and on occasion Taplin changed the room arrangements with no prior consultation with Mednick. Use of the rooms was limited to Harbour House tenants, their guests, members of the house clubs, and customers of the restaurant on the premises. Mednick did not advertise to increase his clientele.

There was never any written contract between the parties, and no document reciting that Mednick was either an independent contractor or an employee. There was no writing as to the duration of the relationship, so presumably either party could terminate at will.

Prior to taking on the cardroom position in 1968, Mednick worked for Harbour House as a menial employee. He had no experience in operating cardrooms. He had never advertised or otherwise held himself out as a cardroom operator or concessionaire. He did not operate cardrooms for anyone else since at least 1970.[2]

■ The terms "independent contractor," "employee," and "employer" are not to be construed in their common law senses when used in federal social welfare legislation. N.L.R.B. v. Hearst, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944) (for purposes of the National Labor Relations Act); United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), and Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947) (for purposes of employment taxes on employers under the Social Security Act, as amended); and Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) (for purposes of the Fair Labor Standards Act). Rather, their meaning is to be determined in light of the purposes of the legislation in which they were used. "[I]n the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service." Bartels, supra, 332 U.S. at 130, 67 S.Ct. at 1550, 91

---

**2.** The trial court found that Mednick worked solely for Harbour House for the period May 1, 1970, the cut-off date under the statute of limitations, to April 1973.

L.Ed. at 1953. This court said in Fahs v. Tree-Gold Co-op. Growers of Florida, Inc., 166 F.2d 40, at 44 (CA5, 1948):

> The ultimate criteria are to be found in the purposes of the act.
>
> Under these decisions [*Silk, Rutherford, Bartels* and *Hearst*], the act is intended to protect those whose livelihood is dependent upon finding employment in the business of others. It is directed toward those who themselves are least able in good times to make provisions for their needs when old age and unemployment may cut off their earnings. The statutory coverage is not limited to those [whose work activities satisfy the common law "control" test] but rather to those who, as a matter of economic reality, are dependent upon the business to which they render service. (footnotes omitted)

And we said more recently in an employment tax case that the test is whether "as a matter of economic reality, [the alleged employees were] dependent upon the taxpayers' business as their means of livelihood." Shultz v. Hinojosa, 432 F.2d 259 (CA5, 1970). See also Walling v. Twyeffort, Inc., 158 F.2d 944 (CA2, 1947), where the court held that a tailor was an employee, despite some indicia of independent contractor status, because the presence of these factors "did not relieve that tailor from exposure 'to the evils the statute was designed to eradicate'," *id.*, at 947–948.

In Rutherford Food Corp. v. McComb, *supra*, the Supreme Court set out specific guidelines for distinguishing employees from independent contractors for purposes of the F.L.S.A.:

(1) The workers did a specialty job on a production line.

(2) The contractual terms did not vary in any material way as one worker succeeded another.

(3) The premises and equipment were those of the proprietor.

(4) The workers had no "business organization" that could offer their services to others.

(5) The proprietor's manager kept close watch over the workers' activities.

(6) The workers could profit from "efficiency," but it was the efficiency of the pieceworker, not that of an "enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor." 331 U.S. at 730, 67 S.Ct. at 1477, 91 L.Ed. at 1778. In United States v. Silk, *supra,* the companion case to *Rutherford* dealing with the meaning of employee for purposes of Social Security taxes, the Court cited other factors that should be taken into consideration: "degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation . . ." 331 U.S. at 716, 67 S.Ct. at 1469, 91 L.Ed. at 1769.

Both parties have selected *Rutherford* and *Silk* factors, showing their presence or absence in subsequent cases with results favorable to their own, arguing that therefore such selected factors should control the disposition of the present case. These arguments give too little weight to the ultimate criteria pointed out above. Additionally, the court below and the parties placed too great reliance on the bare legal powers which each of the parties had under their informal working agreement. The result was to permit potential powers of little or no effective significance in the actual operation of the working arrangement to overweigh the actual operation, the "economic reality" of the situation. Under the Supreme Court's opinion in Goldberg v. Whitaker House Coop., 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961), this was error.

Considered in isolation, the *Rutherford* and *Silk* criteria produce no clear cut conclusion in this case. Mednick's work was not specialized and could be learned in about an hour's time. But it was not an integrated part of the business of Harbour House in the same way as the work of the meat boners in *Rutherford* or of the mechanic in Hodgson v. Ellis Transportation Co., 456 F.2d 937

(CA9, 1972), although it may have been very useful or even necessary in the market in which Harbour House competed. The premises and equipment—furniture and chairs—were those of Harbour House, but not much other equipment was needed for the service-oriented business. Harbour House's manager did watch over Mednick, but more to protect Harbour House's interest in its facilities and the general run of operations than to oversee the detail of work as in *Rutherford.* Mednick's supply of inventory in the form of candy and playing cards gave some room for economizing and thus increasing "profits," but the leeway and the amounts involved were too modest to be probative. And the investment was in inventory which was recouped almost immediately.[3] Mednick had other means of increasing his "profits," but the means available were really indistinguishable from those available to any employee who relies for his livelihood on gratuities from customers.[4] The relationship was somewhat more permanent than is normally the case for an independent contractor. More significant is the lack of any contractual tie. Mednick could be fired as quickly as he fired his own employees. Finally, Mednick had nothing that could be called a "business organization." He could hire and fire subemployees, and had only one or two persons working for him at a time; he paid these subemployees; his presence was not required; and he could have worked elsewhere. Whatever the Court might have meant as "business organization" in *Rutherford,* it could not have meant these factors, for all were present in that case as well.[5]

There are factors which arguably suggest that Mednick was an independent contractor. He hired and fired his own employees. But the courts have had little difficulty in finding employment status though the employee could hire others within his own discretion. *Rutherford, supra, Twyeffort, supra,* Mitchell v. Strickland Transportation Co., 228 F.2d 124 (CA5, 1955). He received compensation from third parties, patrons of the cardrooms and the house social clubs. Again, redcaps who receive as their only compensation gratuities from railroad station patrons have been treated as employees. Southern Ry. Co. v. Black, 127 F.2d 280 (CA4, 1942), Walling v. Portland Terminal Co., 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947). Finally, Mednick was free to make certain purchases out of his own pocket to improve the services and increase his compensation. But persons with much more substantial pecuniary obligations have been held to be employees. Tobin v. Cherry River Boom and Lumber Co., 102 F.Supp. 763 (S.D.W.Va., 1952); Hodgson v. Pulley, *supra* at 1046 (S.D.Ohio, 1972).

But when we consider the precisely targeted criteria in the light of the ultimate inquiries that are drawn from the purposes of the Act itself, the answer becomes clear. Is Mednick the kind of person meant to be protected by the F.L. S.A.? Is he "dependent upon finding employment in the business of others . . ., [one of] those who themselves are least able in good times to make provisions for their needs when old age and unemployment may cut off their earnings"? *Tree-Gold, supra.* See also Shultz v. Hinojosa and Walling v.

---

**3.** As in Hodgson v. Pulley, 20 W. H. Cases 1046 (S.D.Ohio, 1972).

**4.** *Cf. Rutherford,* in which the court noted that the boners could increase their "profits" by being more efficient, but where such efficiency was the same that any piecerate employee would use to increase his income. 331 U.S. at 730, 67 S.Ct. at 1476, 91 L.Ed. at 1778–1779.

**5.** Appellee's assertion that this case is different from *Rutherford* because the boners there were required to join the union is disingenuous at best. The boners were never a party

to that agreement, they were not classified in the union contract, they were not represented by or answerable to the union steward, their dues were not under check-off as other employees' were, and their dues were never collected by the plant operator. All of this suggests that their union membership was illusory, an attempt by the union to assert jurisdiction which the company permitted but which neither bothered to enforce, if they could have. *See* Walling v. Rutherford Food Corp., 156 F.2d 513, 515–516 (CA10, 1946), and Rutherford Food Corp. v. McComb, 331 U.S. at 725, 67 S.Ct. at 1474, 91 L.Ed. at 1776.

Twyeffort, *supra.* The concept has also been put in terms of whether the individual is "in business for himself," Hodgson v. Ellis Transportation Co., *supra.* In Mitchell v. Strickland Transportation Co., *supra*, this court held two workers' power to hire subemployees was not "a manifestation of a business operation by each as entrepreneur," *id.,* 228 F.2d at 128. In Mitchell v. John R. Cowley and Bro., Inc., 292 F.2d 105 (CA5, 1961), this court looked to the "economic reality" behind a night security guard's contract to find:

> [T]his record does not supply any of the indicia of a genuinely maintained and operated watchman enterprise followed by the worker . . . as a business as distinguished from personal employment. (footnote omitted)

*Id.,* at 109. When the entire spectrum of circumstances is examined in these terms, we think Mednick is within the protection of the Act.[6]

Next we consider the undue reliance given to bare legal powers. The courts have struggled with the disparity between legal relations and economic reality in a number of differing situations. It is clear beyond peradventure that the parties' attempt to fasten a name of "independent contractor" or "employment" to their relationship by their own agreement—or, worse, where one party imposes a name on the other—will avail them little in ascertaining what the relationship is for purposes of the F.L.S.A. or similar legislation. Bartels v. Birmingham, and Mitchell v. Strickland Transportation Co., *supra.* The Supreme Court has also held that even relationships deriving from corporate identities properly established under state law will not be controlling for ascertaining whether the relationship is also one of employment, *vel non,* for the purposes of the F.L.S.A. Goldberg v. Whitaker House Coop., *supra.*

In the instant case, the putative independent contractor appeared to have certain legal rights and powers that are normally incidents of independent business establishments. The court below put considerable reliance on the various ways Mednick *could* have acted under the terms of the unwritten working agreement. Mednick was free to make potentially significant purchases out of his own funds. He was free to hire others to work in his stead, and never to appear personally at all if he so chose. He had patrons whom he billed separately on a monthly or multi-monthly basis. All of these powers are normally incident to one running his own business. But under the circumstances shown here, there was no economic substance behind these various powers. The purchases were only a burden on Mednick; they did not enable him to derive any distinct source of profit. At best they might bring an increase in gratuities. His power to hire and fire was as a practical

---

6.  Wirtz v. Welfare Finance Corp., 263 F.Supp. 229 (N.D.W.Va., 1967), illustrates the use to be made of indicia like those prescribed by *Rutherford* and *Silk* and the ultimate significance of the individual's "economic dependence" or "independent calling," in particular the history and background of the individual's work activity. The court was faced with two individuals doing janitorial work under similar contracts for the same company. Both did some janitorial work for other companies. But one had advertised as a janitorial service contractor and had worked for other companies over a period of about ten years, and thus had held himself out as in the business of supplying janitorial services under contract. The other worker had not so held herself out nor had she a history of performing such work for others, although she did have one other cleaning job contemporaneous with her work for defendant in that case. The contractual relationships between the workers and the company were essentially identical, but the former was held to be an independent contractor and the latter an employee. *Id.,* at 238.

The court correctly perceived that the test of "economic reality" goes to the question of whether the individual whose status is in question was in fact an independent businessman.

matter narrowly circumscribed by Taplin, and whether he could have had subemployees do any more than work weekends and on occasional days off for him is not clear. He "billed" his group patrons, but their access to the cardrooms was narrowly circumscribed by Harbour House, which allowed only residents, their guests, and customers of the on-premises restaurant to use the rooms. At no point did Mednick have anything that could be called a business, assuming that Harbour House would have permitted itself to lose control of an operation so important to it. The inchoate economic character of these legal powers and relationships is underscored by the origin of the work relationship. Mednick was a menial employee with no experience or qualifications to distinguish him from the general run of workers. He was given certain freedoms and liabilities, and to some degree the appearance of an independent contractor. An employer cannot saddle a worker with the status of independent contractor, thereby relieving itself of its duties under the F.L.S.A., by granting him some legal powers where the economic reality is that the worker is not and never has been independently in the business which the employer would have him operate. *Cf.* Goldberg v. Whitaker House Coop., *supra.* Whatever the formal legal powers subsisting in the relationship, Mednick did not have his own business calling of "cardroom concessionaire" and cannot be considered an independent contractor for purposes of the F.L.S.A.

In light of our disposition of the employee-independent contractor issue, we need not rule on any other issues.

Reversed and remanded.