**W. J. USERY, Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,**

v.

**PILGRIM EQUIPMENT COMPANY, INC., et al., Defendants-Appellees.**

**No. 74–2909.**

United States Court of Appeals, Fifth Circuit.

March 3, 1976.

1310

William J. Kilberg, Sol. of Labor, Donald S. Shire, Carin Ann Clauss, Assoc. Sol., U. S. Dept. of Labor, Washington, D. C., George T. Avery, William E. Everheart, Atty., Reg. Sol., U. S. Dept. of Labor, Dallas, Tex., Sandy McCormack, U. S. Dept. of Labor, Washington, D. C., for plaintiff-appellant.

William Key Wilde, Ron D. Daugherty, Houston, Tex., for defendants-appellees.

1. The named defendants in this action include: Pilgrim Equipment Company, Inc., a corp.; Pilgrim Convenience, Inc., a corp.; R.F.S., Inc., No. 10, a corp., d/b/a Pilgrim Laundry Co. No. 18; Pilgrim Laundry Co. No. 5, Inc., a corp.; R.F.S., Inc. No. 2, a corp., d/b/a Pilgrim Laundry Co. No. 8; Tower Development Corp., a corp., d/b/a Pilgrim Laundry Co. No. 16; R.F.S., Inc. No. 5, a corp., d/b/a Pilgrim Laundry Co. No. 11; R.F.S., Inc. No. 8, a corp.,

Before WISDOM, CLARK and RONEY, Circuit Judges:

CLARK, Circuit Judge:

The Secretary of Labor challenges the independent contractor status assigned to approximately 60 women operators of laundry pick-up stations by 10 related corporations, which we group here under the common appellation Pilgrim.[1] In capsule, each operator works at a separate location to which customers bring items to be cleaned. Pilgrim picks up, cleans and returns the items. The operator then makes delivery to the customer and collects the cleaning price.

Concluding from undisputed facts that Pilgrim had correctly classified these operators as nonemployees for wage and hour purposes under the Fair Labor Standards Act (FLSA),[2] the district court denied the relief sought by the Secretary's complaint. Although it framed its findings in the proper indicia for testing statutory employee status, the district court's conclusion of what the frame enclosed failed to give sufficient emphasis to the all-pervasive determinant economic dependence. The legal conclusion reached by the trial court from its factual findings was, therefore, in error. We reverse and remand for a determination of the appropriate relief for these employees.

The purpose of the FLSA is to "eliminate low wages and long hours" and "free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well-being of workers."[3] The statutory scheme makes

d/b/a Pilgrim Laundry Co. No. 15; Pilgrim Laundry Co. No. 3, Inc., a corp.; and R.F.S., Inc. No. 7, a corp., d/b/a Pilgrim Laundry Co. No. 14.

2. 29 U.S.C. § 201 et seq.

3. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727, 67 S.Ct. 1473, 1475, 91 L.Ed. 1772 (1947).

the wage and hour provisions applicable to "employees." Employee is defined as one "employed," and "employ" is defined as "to suffer or permit to work."[4] Given the remedial purposes of the legislation, an expansive definition of "employee" has been adopted by the courts.

As the federal social security legislation is an attack on recognized evils in our national economy, a constricted interpretation of the phrasing by the courts would not comport with its purpose. Such an interpretation would only make for a continuance, to a considerable degree, of the difficulties for which the remedy was devised and would invite adroit schemes by some employers and employees to avoid the immediate burdens at the expense of the benefits sought by the legislation.[5]

The common law concepts of "employee" and "independent contractor" have been specifically rejected as determinants of who is protected by the Act.[6] The test is not one which allows for a simple resolution of close cases. However, the lesson taught by the Supreme Court's 1947 trilogy[7] is that any formalistic or simplistic approach to who receives the protection of this type legislation must be rejected. In *Bartels v. Birmingham*, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947), the Court held that "in the application of social legislation employees are those who as a matter of economic reality are *dependent* upon the business to which they render service."[8]

■ Five considerations have been set out as aids to making the determination of dependence, *vel non*. They are: degree of control, opportunities for profit or loss, investment in facilities, permanency of relation, and skill required.[9] No one of these considerations can become the final determinant, nor can the collective answers to all of the inquiries produce a resolution which submerges consideration of the dominant factor—economic dependence. *See Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297 (5th Cir. 1975). The five tests are aids—tools to be used to gauge the degree of dependence of alleged employees on the business with which they are connected. It is *dependence* that indicates employee status. Each test must be applied with that ultimate notion in mind. More importantly, the final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of FLSA or are sufficiently independent to lie outside its

---

4. 29 U.S.C. § 203(e) & (g).

5. *United States v. Silk*, 331 U.S. 704, 712, 67 S.Ct. 1463, 1467, 91 L.Ed. 1757 (1947).

6. The terms "independent contractor," "employee," and "employer" are not to be construed in their common law senses when used in federal social welfare legislation. *N.L.R.B. v. Hearst*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944) (for purposes of the National Labor Relations Act); *United States v. Silk*, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), and *Bartels v. Birmingham*, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947) (for purposes of employment taxes on employers under the Social Security Act, as amended); and *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) (for purposes of the Fair Labor Standards Act). Rather, their meaning is to be determined in light of the purposes of the legislation in which they were used.

*Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297, 299 (5th Cir. 1975).

7. *Bartels v. Birmingham*, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); *United States v. Silk*, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947).

8. 332 U.S. at 130, 67 S.Ct. at 1550 (emphasis added).

9. *United States v. Silk*, 331 U.S. 704, 716, 67 S.Ct. 1463, 1469, 91 L.Ed. 1757 (1947). *See, Bartels v. Birmingham*, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); *N.L.R.B. v. Hearst*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). Although several of these cases deal with similar but different statutes, *Rutherford* adopts decisions under the "Labor and Social Security Acts" as "persuasive in the consideration of a similar coverage under the Fair Labor Standards Act." 331 U.S. at 723, 67 S.Ct. at 1474.

ambit. Reviewing each of the five indicia used by the lower court, with the emphasis placed as required, compels the ultimate conclusion that the pick-up station operators in this case were dependent on Pilgrim and, therefore, come within the Act. It also discloses that the district court's factor-by-factor resolutions were wrong.

## I. Control

██ The district court determined that operators are largely independent of their manager's control. However, a look at the rules and restrictions on the operators contained in the written lease agreement and the undisputed facts shows the operators are totally dependent upon Pilgrim to provide direction or control in every major aspect of their work. Pilgrim handles substantially all advertising for the stations. It sets the prices charged for all but a few nonstandard items. It requires that operators deal exclusively with Pilgrim Laundries.[10] It prevents the assignment of the lease arrangements which govern the parties' respective obligations. It requires that each operator remit a certain amount of money every day for the cleaning work done by Pilgrim. It requires that accounts be settled between Pilgrim and each operator once a week. It prevents operators from posting any signs on the premises unless prior permission is given. It prevents any improvement to the premises without permission. The lease is drawn by Pilgrim and the only negotiated item is the percentage of income the operator would retain, an item which is usually unilaterally imposed at the outset by Pilgrim and then negotiated on the anniversary of each contract. Pilgrim maintains the right to specifically enforce or declare the contract void if any covenant is not performed by the operator. The contract has a duration of 1 year. Each operator is given the right to set her own hours, hire helpers and is not subject to inspection of supervision in the minor details of her daily operation. A sign posted on the front door of each pick-up station, however, states the standard Pilgrim Laundry hours. With minor exceptions, all operators testified that they followed these hours. Some of the operators hired helpers or substitutes from time to time and some did not.

In the total context of the relationship neither the right to hire employees nor the right to set hours indicates such lack of control by Pilgrim as would show these operators are independent from it. In reality, even the hours are "controlled" by Pilgrim. It is not significant how one "could have" acted under the contract terms. The controlling economic realities are reflected by the way one actually acts.[11] Moreover, women who work at home, completely free of specific hour requirements, have been found to be employees for purposes of this Act.[12] Occasional exercise of the right to hire helpers also has not been found sufficiently indicative of independence to allow a finding of nonemployee status.[13]

The most significant conclusion from all these facts is that the operators cannot exert control over any aspect of their business lives independent of Pilgrim. They have no viable economic status that can be traded to other laundry companies and the lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence.[14] Control is only significant when it shows an individual exerts such a control over a meaningful part of the

10. See note 1, *supra.*

11. *See Mednick v. Albert Enterprises,* 508 F.2d 297, 302–03 (5th Cir. 1975); *Mitchell v. John R. Cowley & Bro., Inc.,* 292 F.2d 105, 109 (5th Cir. 1961).

12. *Goldberg v. Whitaker House Cooperative,* 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961).

13. *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); *Mednick v. Albert Enterprises, Inc.,* 508 F.2d 297, 301 (5th Cir. 1975); *Mitchell v. Strickland Transportation Co.,* 228 F.2d 124, 128 (5th Cir. 1955).

14. *Mitchell v. John R. Cowley & Bro., Inc.,* 292 F.2d 105, 108 (5th Cir. 1961).

business that she stands as a separate economic entity. All meaningful aspects of this business—advertising, right to deal with other cleaning plants, price fixing, payment arrangements—are controlled by Pilgrim.

## II. Opportunity for Profit or Loss

The lower court concluded that the opportunities for profit or loss were the same as in any independent business. The major determinants of the amount of profit which an operator could make, however, were directly controlled by Pilgrim. Since the operators were paid on a percentage basis, the amount of business done by an operator governs total profit. The lower court found that convenience of hours, extra service provided, and rapport with customers were factors which affected profits and were within the control of each operator. However, price, location, and advertising—determinants of customer volume at least as vital as those governed by the operators—are regulated by Pilgrim.

▇ The record shows some operators sold ties, wigs, or took in special work in their pick-up stations. These sales minimally supplemented their income. Such minor additional income made from work which is not connected with the actual business under examination is not relevant to a court's determination of employee status.[15]

▇ Finally, except for being responsible for bad-check and theft losses, there is no way any of the operators can suffer a loss in their alleged independent contractor operations. Each week they receive a percentage of the total money taken in by their pick-up station. The lease requirement—which the record does not show was ever subject to negotiation—that the operators accept re-

sponsibility for bad-check and theft losses does not show independence. Rather it shows that Pilgrim chose to place this added burden on its operators. Persons with similar pecuniary obligations have been found to be employees.[16]

No opportunity for loss of the capital investment in the station's operation and control by Pilgrim of major determining factors of profit indicate that the operators are dependent upon Pilgrim, and therefore, that they are employees.

## III. Investment

▇ The lower court found that the operators' "investment" was modest, but concluded that it was substantial from the point of view of each operator. The investment referred to by the lower court was the requirement that each operator "purchase" the cleaning charge values in the clothing already on hand at the pick-up station when she took over the operation. The "investment" transaction bears no direct relationship to the overall cost of operating the station. It is actually an assumption of accounts receivable. No risk capital whatsoever is involved.[17]

At the outset of the business relationship between Pilgrim and each operator, the new operator is required to pay the outgoing operator (or Pilgrim if Pilgrim had already reimbursed the outgoing operator) the total amount which the outgoing operator had paid Pilgrim to clean clothes not yet picked up by customers. This "investment" varies from 500 to 1500 dollars. Often it is financed by Pilgrim, and its return is guaranteed. As customers pick up their clothes and pay for them, the operator recoups her "investment." Any clothes which remain in the station for 6 months are purchased by Pilgrim. Therefore, within 6 months the total "investment" is recovered. In

---

15. *Brennan v. Partida*, 492 F.2d 707, 709 (5th Cir. 1974).

16. *Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297, 301 (5th Cir. 1975), *citing, Hodgson v. Pulley*, 20 W.H. Cases 1046 (S.D.Ohio, 1972).

17. *See Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297, 301 (5th Cir. 1975); *Hodgson v. Pulley*, 20 W.H. Cases 1046 (S.D.Ohio, 1972); *Hodgson v. Sureway Cleaners*, 20 W.H. Cases 358 (E.D.Cal.1971).

addition, when the operator terminates her arrangement with Pilgrim, she will be reimbursed for all monies paid by the operator to Pilgrim for clothing not yet retrieved and paid for by customers. This entire "investment" plan is nothing more than a method of settling accounts between outgoing and incoming operators.

All investment or risk capital is provided by Pilgrim. It furnishes the station, cash register, fixtures, security devices, counters, racks, hangers, bags, tags, receipts, utilities, telephone, and liability insurance. The 10 dollar per-year rental set up for these capital items is so nominal as to be de minimis.

But for Pilgrim's provision of all costly necessities, these operators could not operate. Their total dependency upon Pilgrim is confirmed rather than denied by these facts.

## IV. Permanency

■ The lower court found that although many operators had enjoyed a longtime relationship with Pilgrim, the permanency of the relationship evidenced satisfaction with and not dependence on Pilgrim. Most, if not almost all, long time employees are satisfied with their employment. Regardless of subjective satisfaction, the permanent nature of the relations between Pilgrim and these operators indicates dependence. The contract involved here is for a 1 year duration and is routinely renewed. Many of the operators have previously served as Pilgrim's employees and are performing essentially the same functions as operators.[18] Not a single operator is shown to be capable of terminating relations with Pilgrim and taking her organization to another laundry.[19] The operators have nothing to transfer but their own labor. The plain fact of

the matter is that every one of them is dependent upon Pilgrim's continued employment.

## V. Skill

■ The lower court correctly concluded from the record that these operators did not need long training or highly developed skills. However, it went on incorrectly to accentuate considerations such as business sense, salesmanship, personality and efficiency concluding that these needed skills were probative of employee status. The key missing ingredient in the lower court's determination is initiative. Routine work which requires industry and efficiency is not indicative of independence and nonemployee status.[20] These operators are unable to exert initiative in the operation of their pick-up stations. All major components open to initiative—advertising, pricing, and most importantly the choice of cleaning plants with which to deal—are controlled by Pilgrim. Much emphasis was placed on the need to keep business records and the need for rapport with customers. Minor record-keeping such as personal tax records is not determinative of independent status. Customer rapport is not an "initiative" characteristic and much more closely parallels "efficiency." But to the extent it does require "initiative," it is significantly controlled, or at least continuously encouraged, by Pilgrim through the commission-rate payment arrangement. The operators receive a percentage of the money paid for each item cleaned. Obviously, encouraging repeat customers enhances financial reward under this payment scheme.

Operating these laundries requires courtesy to customers, tagging clothes, taking money from customers, paying Pilgrim a set amount each day for clean-

---

18. *See Wirtz v. Welfare Finance Corp.*, 263 F.Supp. 229 (N.D.W.Va.1967).

19. *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730, 67 S.Ct. 1473, 1477, 91 L.Ed. 1772 (1947); *Bartels v. Birmingham*, 332 U.S. 126, 132, 67 S.Ct. 1547, 1551, 91 L.Ed. 1947 (1947).

20. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); *Mitchell v. John R. Cowley & Bro., Inc.*, 292 F.2d 105, 108 (5th Cir. 1961); *Mitchell v. Strickland Transportation Co.*, 228 F.2d 124, 126–27 (5th Cir. 1955).

ing, settling accounts (getting paid) once a week, occasionally hiring helpers, and correctly reporting tax and Social Security information. The skills and incentives required in the operation of the pick-up stations are valuable. They bring business profits to the operators and to Pilgrim. But many successful employees need these same abilities and perform similar tasks. The bottom line in this enterprise is the business acumen and investment contributed by Pilgrim. The operators were dependent for their livelihood.

## VI. Other Indicia.

We reject both the declaration in the lease agreement that the operators are "independent contractors" and the uncontradicted testimony that the operators believed they were, in fact, in business for themselves as controlling FLSA employee status. Neither contractual recitations [21] nor subjective intent [22] can mandate the outcome in these cases. Broader economic realities are determinative.

In deciding whether these operators are employees for the purposes of the Fair Labor Standards Act,

> [t]he ultimate criteria are to be found in the purposes of the Act. . . .
>
> [T]he Act is intended to protect those whose livelihood is dependent upon finding employment in the business of others. It is directed toward those who themselves are least able in good times to make provisions for their needs when old age and unemployment may cut off their earnings . . . to those who, as a matter of economic reality, are dependent upon the business to which they render service.

*Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297, 300 (5th Cir. 1975), *quoting, Fahs v. Tree-Gold Co-op Growers, Inc.*, 166 F.2d 40, 44 (5th Cir. 1948).

The overview discloses that these operators are not allowed to control any meaningful portion of the business they allegedly run; Pilgrim manages the major variables which determine each operators profit. The compensation scheme is such that there is never any real risk that an operator will suffer loss. Substantially all risk capital is supplied by Pilgrim. The relationship is fairly permanent and there is no operator who, as an economic entity, is capable of doing business elsewhere. No unique skill or initiative is required of the operators. Proper application of the five indicia, singularly and collectively, indicate substantial dependence on Pilgrim. The Act is designed to protect individuals whose employment status is so dependent on the whims of the employer as to make them submissive to an employer's notion of fair compensation for their labor. The degree of dependence by the operators upon Pilgrim in this case mandates a conclusion that the operators are employees under the FLSA. Therefore, the decision of the lower court is reversed and the case is remanded to determine the appropriate relief.

Reversed.

---

**21.** *United States v. Silk*, 331 U.S. 704, 715, 67 S.Ct. 1463, 1469, 91 L.Ed. 1757 (1947); *Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297, 302 (5th Cir. 1975); *Mitchell v. John R. Cowley & Bro., Inc.*, 292 F.2d 105, 107 (5th Cir. 1961).

**22.** *Brennan v. Partida*, 492 F.2d 707, 709 (5th Cir. 1974); *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508 (5th Cir. 1969).