Charles THOMAS, Plaintiff,

v.

William E. BROCK, Secretary of Labor, United States Department of Labor, Defendant.

William E. BROCK, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

GLOBAL HOME PRODUCTS, INC., a corporation, d/b/a North Carolina Youth Team, Student Aid Program and Junior Opportunities; Fund Raiser Products, Inc., a corporation, d/b/a North Carolina Youth Team, Student Aid Program and Junior Opportunities; Gerald Winters; and Ronald Kelso, Defendants.

Nos. C–C–84–290–M, C–C–84–444–M.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Aug. 23, 1985.

[redacted] 

[redacted]

Charles R. Brewer, U.S. Atty., Asheville, N.C., Debra J. Stuart, Asst. U.S. Atty., Charlotte, N.C., Francis X. Lilly, Sol. of Labor, Washington, D.C., Bobbye D. Spears, Regional Sol., A.B. Cuviello and William H. Berger, Office of the Solicitor, U.S. Dept. of Labor, Atlanta, Ga., for Department of Labor.

Gerald A. Smith, Jr., Donald F. Mintmire and David T. Hooper, Barnett & Alagia, Nashville, Tenn., David B. Sentelle, Tucker, Hicks, Sentelle, Moon and Hodge, Charlotte, N.C., for Charles Thomas, Global Home Products, Inc., Fund Raiser Products, Inc., Gerald Winters and Ronald Kelso.

McMILLAN, District Judge.

These two cases were consolidated for trial by the court on June 18, 1985. The parties have agreed that for the purposes of both actions, William E. Brock, the Secretary of Labor, will be considered as the plaintiff, and Charles Thomas; Global Home Products, Inc.; Fund Raiser Products, Inc.; Gerald Winters and Ronald Kelso will be the defendants.

Plaintiff seeks an injunction against defendants to prevent them from continued alleged violations of child labor laws. Defendants seek a declaratory judgment that these laws do not apply to them and ask that plaintiff be enjoined from attempting to enforce these laws against them.

Based on the evidence submitted at trial and upon consideration of the briefs filed by the parties, the court makes the following

## FINDINGS OF FACT

1. The parties have stipulated that:

a) Global Home Products, Inc., Fund Raiser Products, Inc., Processing Sales, Inc., Junior Careers, Inc., Gerald Winters and Ronald Kelso were and are engaged in related business activities performed either through unified operation or common control for a common business purpose and therefore comprise an "enterprise" within the meaning of Section 3(r) of the Fair Labor Standards Act, 29 U.S.C. § 203(r). Such enterprise is hereinafter referred to as the "Global Home Products Enterprise" or "Enterprise."

b) The Global Home Product Enterprise, having employees engaged in commerce or in the production of goods for commerce, and/or employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce; and having annual gross volume of sales made or business done in excess of $250,000 (exclusive of excise taxes at the retail level which are separately stated), constitutes an "enterprise engaged in commerce or in the production of goods for commerce," within the meaning of § 3(s)(1) of the Act, 29 U.S.C. § 203(s)(1);

c) Since at least January 1, 1982, the Global Home Products Enterprise, which is engaged in the distribution, sale or resale of candy, confectionary and cookie products, has utilized business entities and individuals (commonly referred to as "distributors"), who are engaged in the sale of these products to the consuming public through the use of minors. The Enterprise has also utilized various public, bonded warehouses in different cities, counties and states to store its products pending distribution, sale or resale. With only infrequent exceptions, only the "distributors" receive or purchase such products from such warehouses.

d) Since at least January 1, 1982, the business entities and individuals ("Distributors") not infrequently utilized, in making sales to the consuming public, minors who are under the age of 14, primarily 12 and 13 year olds, but on an infrequent basis minors as young as nine years old. These minors not infrequent-ly sell the products after 7:00 p.m. on weekdays during the school year, and on an infrequent basis they sell as late as 10:00–10:30 p.m. on weekdays during the school year. The minors not infrequently sell the products more than three hours per day on weekdays and more than 18 hours per week when school is in session and more than eight hours per day on the weekends.

e) Since at least January 1, 1982, the Global Home Products Enterprise and Charles Thomas have failed to make, keep and preserve adequate and accurate records of names, addresses, ages and hours worked as set forth in the Act, and the regulations, of the persons (including minors) engaged in the sale of the aforementioned products.

f) The minors utilized by Charles Thomas in the sale of the aforementioned products are at least employees of Charles Thomas within the meaning of the Act.

2. William Brock is the Secretary of Labor.

3. Charles Thomas is a resident of Charlotte, North Carolina, who sells cookies and candy door-to-door through the employment of local children.

4. The Global Home Products Enterprise (Global) oversees the manufacturing of the cookies and candy and sells them to local groups, retail stores and door-to-door salesmen such as Charles Thomas. The products are manufactured in Georgia, Illinois and New York, with ingredients being imported from abroad. Approximately fifty percent of Global's sales are to door-to-door salesmen, such as Mr. Thomas.

5. Charles Thomas first became connected with Global in California during or prior to 1982 when he met Curtis Richardson, who is now a district manager of Global products in the southeast, operating out of Atlanta, Georgia. Charles Thomas signed a contract with Curtis Richardson, which he believes Richardson signed on behalf of Global.

6. Charles Thomas moved to Washington, D.C., in September of 1982, and lived with James Richardson, the brother of Curtis Richardson. James Richardson sold Global products in the District of Columbia. He recruited children to go door-to-door selling the cookies and candy for $3.00 a box. James Richardson held the position of a crew manager, which entailed recruiting children to make the sales, taking them to neighborhoods, supervising them in the sales. He worked under the name of Student Aid Program.

7. After about a month of observation, Charles Thomas became a crew manager in Washington, D.C. He recruited children to sell cookies and candies for him which he purchased from Global. He also instructed his salespeople to charge $3.00 per box. Charles Thomas paid Global $1.65 a box.

8. Curtis Richardson asked Charles Thomas to move to Charlotte, North Carolina, in early 1983 and to sell Global products from this location. He operated at different times first under the name North Carolina Youth Team and then under the name Student Aid Program, the same name used by James Richardson in Washington, D.C.

9. Curtis Richardson "promoted" Charles Thomas to the position of area manager. This meant that in addition to supervising his own crew of children, Charles Thomas could recruit other crew managers who would also supervise groups of children. As an area manager, Charles Thomas would not only receive a portion of the purchase price for each box of cookies and candy that his crew sold, but he would also receive a [smaller] portion of all the sales under his crew managers.

10. At the beginning of his work in Charlotte, Charles Thomas advertised that he wanted to hire children between the ages of twelve and sixteen. After learning of state laws, he later only advertised for children between the ages of fourteen and eighteen.

11. Charles Thomas routinely attempts to talk with the parents of his crew members before they begin work with him. He speaks with most of the parents and has them sign a parent permission form which tells the parents of some of the working conditions. However, he has not spoken with all parents or received parent permission forms from parents of all the children.

12. Charles Thomas instructs his sales force on their responsibility to be ready to work and gives them speech cards to practice their sales pitch to customers. One of the documents given to the children states that "I have too much homework" is not an acceptable excuse for missing work.

13. Charles Thomas drives a van to pick up the children at their homes. He takes them to a neighborhood and assigns them streets on which they are to sell the cookies and candy. The children go door-to-door selling the cookies. They then give Mr. Thomas the checks and cash that they receive for the products. The children are paid $.60 per box sold, out of the purchase price of $3.00 per box.

14. During periods in which school is in session, Charles Thomas has frequently kept children away from home past 7:00 p.m. during the week, often as late as 9:00 p.m. On weekends, he usually takes the Charlotte children out of the Charlotte area and often has not returned them to their homes until 11:30 p.m. or 12:00 midnight. Parents of the children testified that their children would return home tired and hungry. Charles Thomas testified that he would often drive the children to a fast-food restaurant when working late.

15. Charles Thomas runs a program of giving bonuses to children for special performance in sales.

16. He testified that he never "fired" children for not selling enough products. The court does not find this testimony credible. Charles Thomas stated that he would refuse to pick up children if they performed poorly, and one of the documents he gave to the children warned that the children would be "fired" if they were not at home too many times when he came by to pick them up.

17. On several occasions, Charles Thomas took children from North Carolina into South Carolina to sell Global products.

18. Charles Thomas employed children under the age of fourteen at least until late 1983, and probably into 1984.

19. Charles Thomas signed a contract with Global when he moved to North Carolina. Curtis Richardson signed the document, but Charles Thomas testified that he did so only as a witness. Defendants no longer have a copy of this contract. Thomas signed another contract with Global Home Products, Inc. on January 29, 1983. This document is entitled "Independent Contractor's Agreement" and states in part that

The parties to this Agreement intend that the relationship between them created hereunder is that of a supplier and independent contractor. No agent, employee, sub-contractor or servant of the Second Party [Thomas] shall be or shall be deemed to be the employee, agent, sub-contractor or servant of First Party [Global]. First Party is interested only in the results obtained under this agreement. While First Party may from time to time suggest certain business methods and techniques to Second Party, the manner and means of conducting the work is under the ultimate sole control of Second Party. None of the benefits provided by First Party to its employees, including by way of possible example, but not limited to, pension plans, medical reimbursement plans, unemployment insurance, sick pay and vacation time, are available from First Party to Second Party or Second Party's employees, agents, servants and sub-contractors during the performance of this Agreement.

Charles Thomas signed in the blank left for the "first" party, but the contract is clear that he is the *second* party." No one signed for Global directly, but Curtis Richardson signed as a witness. The contract also provides that

Either party may cancel this Agreement by giving thirty days written notice to the other. After termination of Second

Party's association with First Party for any cause, Second Party will not directly or indirectly engage in a similar or like-type business within a 100 mile radius from the [*left blank*] for a period of two years. Second Party's violation hereof shall require him to pay either actual damages as awarded by a Court of competent jurisdiction, or liquidated damages of $10,000.00, whichever First Party may elect to request, both to be in addition to attorneys' fees otherwise due pursuant hereto.

20. Charles Thomas, by himself, was unable to purchase a van to take the children and cookies to neighborhoods. He received a loan from Global to purchase a van which has been registered in the name of Fund Raiser Products, Inc., one of the corporations in the "Global" group. Global arranges such loans for some area and crew managers who can not obtain credit themselves. The crew managers and area managers then pay back the loan to Global. Charles Thomas paid off the loan in June of 1984, but title of the van was not changed to his name until September of 1984.

21. The speech cards and parent permission forms that Charles Thomas used were the same as those used by James Richardson. Thomas also used a form "answer to objections" for the children to use to respond to reasons given for not buying the cookies. Thomas received this form at a seminar for crew and area managers that was sponsored and paid for by Global.

22. At different times, Charles Thomas had his own crew managers working under his supervision. Mr. Thomas engaged David Tate as an "independent contractor" and had him sign a Global contract similar to the one Thomas had signed. Thomas signed it and testified that he represented Global in doing so. Thomas also recruited Estee Bullock as a crew manager for a short period.

23. Global ships cookies and candy to a bonded warehouse in Charlotte in anticipation of the needs of its "customers." Global does not ship products to fill particular

orders. As stated in the stipulations, with a few exceptions only the door-to-door salesmen obtain goods from the warehouses. Mr. Thomas phones Global and requests that a certain number of boxes be made available to him. He then goes to the warehouse, where upon approval of Global he receives the cookies and candy. Thomas delivers to the warehouse officials the checks he has received from the children and a cashier's check for most, if not all, of the cash received. The warehouse officials then mail the checks to Global. However, Thomas's delivery of the checks to the warehouse is not a prerequisite to obtaining more candy and cookies if Global has already approved the transfer. Thomas then takes the products and stores them in his own smaller warehouse. The goods are left there until Thomas removes them for the sales trips with the children.

24. Global does all of the bookkeeping for Charles Thomas and Curtis Richardson. After receiving the checks from Charles Thomas, Global sends him back a check for his portion of the sales. He is not charged for bad checks that the children have received. Testimony shows that this bookkeeping arrangement is limited to the operation for Curtis Richardson, who, according to Jerry Winters, one of the corporate officials of Global, has needed some additional help in starting his operation. Global charges Curtis Richardson for this service.

25. Charles Thomas telephones Global two or three times a week and reports his weekly sales to them and gives weekly goals for future sales. In addition, he phones the district manager, Curtis Richardson, once or twice a week.

26. During the early period of Thomas's work in Charlotte, Curtis Richardson paid part of Thomas's expenses, including portions of his telephone bills, gasoline costs, and bonuses to the children. There appears to have been no fixed rule to determine which expenses were paid and which were not. Thomas testified that his expenses are no longer paid by others. He explained that some of the payments were part business payments and part personal loans, but no record was kept of the amounts that were personal loans.

27. Global did not directly recruit Thomas as an area manager. Curtis Richardson first encouraged Thomas to become involved.

28. Global did not directly train Thomas or give him sales materials, except for those he received at the Global-sponsored seminars.

29. Global has not paid for the costs of Thomas's move from Washington, D.C. to Charlotte and has not bought him any equipment other than providing the credit for the van.

30. Global does not control what hours Thomas works or the number of children that he takes out on his sales trips.

31. Charles Thomas collects sales taxes on the cookies and candy and files his own income tax returns on his business activities.

32. Although Thomas has used the same prices for cookies and candy as used by other salesmen, Global does not mandate that this price be set, but only recommends the price.

33. Global runs sales meetings for the salesmen to discuss marketing and other business. Although he often attends, Charles Thomas is not required to be there.

34. Charles Thomas sets his own bonus programs for the children.

35. Global pays for area and crew managers to attend seminars to help their sales. At these seminars, sales materials and motivational literature is given to area and crew managers. Charles Thomas has attended seminars. Jerry Winter testified that the seminars are funded by a charge of a nickel a box for the candy purchased by those attending the seminars. Most of the seminars have been run by Larry Prossen, a district manager in Florida. He receives money from Global for organizing and running these seminars.

36. Global is paying all the litigation costs and attorney fees for Charles Thomas in these suits. This includes the costs and

fees of the suit brought by Thomas against William Brock, in which the Global enterprise is not a party.

37. Global has written to distributors asking them to pay for one-half of other litigation affecting the enterprise.

38. Upon completion of this litigation, Global expects to sell all of its interest in the door-to-door sales to Miller Candy Sales, Inc., in which Ronald Kelso, Kevin Miller, and Andy Brown will have interests. Jerry Winters expects that the Global Enterprises will then cease to exist, and he will have no personal interest in the door-to-door sales.

## CONCLUSIONS OF LAW

1. This court has jurisdiction pursuant to 29 U.S.C. § 217, 28 U.S.C. § 1331.

2. Plaintiff seeks an injunction to prevent defendants from further violation of the following statutes:

29 U.S.C. § 211(c)—Every employer subject to any provision of this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder.

29 U.S.C. § 212(c)—No employer shall employ any oppressive child labor in commerce or in the production of goods for commerce or in any enterprise engaged in commerce or in the production of goods for commerce.

29 U.S.C. § 215(a)—After the expiration of one hundred and twenty days from June 25, 1938, it shall be unlawful for any person—.... (4) to violate any of the provisions of section 212 of this title; (5) to violate any of the provisions of section 211(c) of this title or any regulation or order made or continued in effect under the provisions of section 211(d) of this title, or to make any statement, report, or record filed or kept pursuant to the provisions of such section or of any regulation or order thereunder, knowing such statement, report, or record to be false in a material respect.

3. The regulations containing the record-keeping requirements are set forth in great length at 29 C.F.R. §§ 516 *et seq.*

4. The Fair Labor and Standards Act (FLSA) provides for a general minimum age for employment of 16:

(*l*) "Oppressive child labor" means a condition of employment under which (1) any employee under the age of sixteen years is employed by an employer (other than a parent or a person standing in place of a parent employing his own child or a child in his custody under the age of sixteen years in an occupation other than manufacturing or mining or an occupation found by the Secretary of Labor to be particularly hazardous for the employment of children between the ages of sixteen and eighteen years or detrimental to their health or well-being) in any occupation,.... The Secretary of Labor shall provide by regulation or by order that the employment of employees between the ages of fourteen and sixteen years in occupations other than manufacturing and mining shall not be deemed to constitute oppressive child labor if and to the extent that the Secretary of Labor determines that such employment is confined to periods which will not interfere with their schooling and to conditions which will not interfere with their health and well-being.

29 U.S.C. § 203(*l*).

5. Pursuant to 29 U.S.C. § 203(*l*), the Secretary of Labor has determined that work by children between ages fourteen and sixteen shall be confined to the following periods:

(1) Outside school hours;

(2) Not more than 40 hours in any 1 week when school is not in session;

(3) Not more than 18 hours in any 1 week when school is in session;

(4) Not more than 8 hours in any 1 day when school is not in session;

(5) Not more than 3 hours in any 1 day when school is in session;

(6) Between 7 a.m. and 7 p.m. in any 1 day, except during the summer (June 1 through Labor Day) when the evening hour will be 9 p.m.

29 C.F.R. § 570.35.

6. The FLSA sets forth the following definitions relevant to this case:

§ 203. Definitions

As used in this chapter—

\* \* \* \* \* \*

(b) "Commerce" means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof.

\* \* \* \* \* \*

(d) "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

\* \* \* \* \* \*

(r) "Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor; ...

\* \* \* \* \* \*

(s) "Enterprise engaged in commerce or in the production of goods for commerce" means an enterprise which has employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and which—

(1) ... beginning February 1, 1969, is an enterprise, other than an enterprise which is comprised exclusively of retail or service establishments and which is described in paragraph (2), whose annual gross volume of sales made or business done is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated);....

7. The parties have stipulated that the Global Home Products Enterprise is both an enterprise as defined in 29 U.S.C. § 203(r) and has sufficient gross volume of sales under 29 U.S.C. § 203(s)(1) to become an "enterprise engaged in commerce or in the production of goods for commerce." The evidence shows that the local organization of Charles Thomas, *by itself,* does not have the gross sales to become an "enterprise engaged in commerce or in the production of goods for commerce."

8. The parties have stipulated that Global and Charles Thomas have failed to maintain "records of names, addresses, ages and hours worked as set forth in the Act, and the regulations, of the persons (including minors) engaged in the sale of the aforementioned products [sale of candy and cookies]."

9. The parties have also stipulated that the business entities and individual distributors have used minors below the age of 14 and children between 14 and 16 outside of the hours permitted by 29 C.F.R. § 570.35. In addition, the testimony at trial shows that Charles Thomas used children below the age of fourteen and employed them for hours outside those permitted in 29 C.F.R. § 570.35.

10. There is no question that the defendants have engaged in *conduct* that does not conform with the statutes and regulations quoted above. The parties agree that the question before the court is whether the statutes and regulations apply to the defendants.

11. Plaintiff advances three theories in contending that Charles Thomas's operation is subject to the FLSA. First, plaintiff

argues that Charles Thomas is the employee of Global. Therefore the employment of children was made by an "enterprise engaged in commerce or in the production of goods for commerce," and Global and Charles Thomas are covered by the FLSA. Second, plaintiff submits that Charles Thomas and Global are joint employers of the children. Finally, plaintiff argues that the children employed are handling goods in commerce and thus fall into the "old" or "traditional" coverage of the FLSA. 29 U.S.C. §§ 203(b), 212(c).

12. Defendants argue that the Charles Thomas organization and those of other distributors are not covered under any of the theories of coverage, and they seek a declaratory judgment to that effect and an injunction against plaintiff prohibiting any enforcement of the statutes against defendants.

■■■ 13. The definition of an "employee" for purposes of the FLSA is broader than the common law definition. *Usery v. Pilgrim Equipment Co., Inc.,* 527 F.2d 1308 (5th Cir.1976), *cert. denied* 429 U.S. 826, 97 S.Ct. 52, 50 L.Ed.2d 89 (1976); *Brennan v. Gilles & Cotting, Inc.,* 504 F.2d 1255 (4th Cir.1974). The fact that two parties have styled their relationship as that of a principal and an independent contractor is not dispositive of the inquiry. *Robicheaux v. Radcliff Material, Inc.,* 697 F.2d 662, 667 (5th Cir.1983). *See also, Real v. Driscoll Strawberry Associates, Inc.,* 603 F.2d 748 (9th Cir.1979). A central question in determining "employee" status under the FLSA is whether or not the alleged employees are, as a matter of economic reality, dependent upon the business to which they render service. *Usery v. Pilgrim,* 527 F.2d at 1311. Courts look not only at the formal structure of an organization but at the underlying reality. *Id.*

■■■ 14. Courts have considered the following factors in determining employee status under the FLSA: (a) control; (b) risk of profit and loss; (c) investment; (d) skills required; (e) permanency of relationship; and (f) integral economic relationship. *Donovan v. Sureway Cleaners,* 656 F.2d 1368 (9th Cir.1981). *See also, Usery v. Pilgrim, supra; Real, supra.* No one factor is controlling. Based on the foregoing findings of fact, the court makes the following analysis.

15. *Control—*

■■■ Charles Thomas has some freedom in his operation. He sets his own hours, hires his own children, and determines who and how many crew managers he will work with. He fixes the bonuses he will pay to children and has the power to change the price of the cookies and candy that the children sell. Along with these powers he has the control that is outlined in the findings of fact. However, much of the control is illusory. Charles Thomas uses the materials received at Global-sponsored seminars. He has followed the recommended prices of Global on all but a few occasions. He files weekly reports on his sales and relies upon Global for the bookkeeping. Looking at the economic reality and what the agent in fact *did* instead of what he *could have done (Donovan v. Sureway Cleaners,* 656 F.2d at 1371), the court concludes that Global in fact controlled, and had the right to exercise considerable control, over Thomas. An important item in this regard is the fact that under the "independent contractor's" agreement Thomas was prevented from competing with Global within 100 miles for a period of two years.

16. *Profit and Loss—*

Charles Thomas had little opportunity for a loss of any significance, mainly because he had so little invested in the operation. Although personal initiative is important with regard to the hours he works and how successful his employees are, his income is more dependent on the piecemeal commission for each box. Profits based on a piecemeal basis do not bring Thomas out of the status of an employee. *See, e.g., Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed.2d 1772 (1947). Thomas's potential for loss is limited to his slim investment in the van, his expenses, and his own time.

17. *Investment*—

Charles Thomas has very little invested in his operation. When he began working, Global gave him a loan in order to buy a van. Some of his expenses were paid for during the early stages of his work in Charlotte. The entire operation has required only modest amounts of capital, and Thomas was helped by Global in making even that small investment.

18. *Skills and Initiative*—

An important element in this factor is the personal initiative that is required of the alleged employee. *Usery v. Pilgrim*, 527 F.2d at 1314. The job of crew manager and area manager did not require any special technical knowledge. Thomas needs only to locate willing children, organize trips to areas for sales, keep a supply of cookies and candy, and motivate the children in their work. Although personal skills are required, the work demands only limited training. However, initiative is an important factor in Thomas's work. He must locate and motivate children and organize their trips.

This factor does not pull strongly in either direction. His job does not require any special skills, but his initiative is important in the success of his operations.

19. *Permanency of Relationship*—

Charles Thomas has worked solely as an area and crew manager selling Global products since October of 1982. Under his "independent contractor" agreement he is prevented from engaging either directly or indirectly in a similar business for two years within a hundred mile radius. Such a limitation is inconsistent with the status of a true independent contractor, who would do similar work for many different people in the same area. The evidence shows that Thomas has been a permanent salesman and the relationship is set up to make it difficult for him to pursue the same line of business with any other supplier. Global has even gone to the extent of paying Thomas's expenses in litigation to which it is not a party.

20. *Integral Economic Relationship*—

Local distributors like Charles Thomas are a major integrated part of Global's business. Approximately fifty percent of Global's sales are to people like Charles Thomas. Global sponsors seminars for the managers, keeps in touch with their sales, and has encouraged the development of the entire distribution structure. Charles Thomas is really the last stage of a major part of Global's operation. He has been completely integrated in the Global structure.

21. Based on the foregoing analysis, the court concludes that Charles Thomas is an employee of Global for the purposes of the FLSA. Charles Thomas has had the type of relationship with Global that was intended to be covered as an employee relationship under that statute. Among the reasons for this conclusion, in addition to all of those analyzed above, are the dependency of Thomas on Global and the permanency of the relationship and his integration into an economic enterprise.

22. Charles Thomas is an employee of Global. Therefore, both he and the Global enterprise are covered by the FLSA, and Thomas's actions are attributable to his employers. The parties have stipulated to defendants' failure to meet the recordkeeping provisions of the FLSA, and the evidence shows that Thomas has engaged in oppressive child labor as that term is defined. Therefore, plaintiff is entitled to an injunction against defendants to prevent further violations.

23. Because the court has concluded that Thomas is an employee of Global, it need not reach the alternative grounds for relief asserted by plaintiff. The court makes no rulings on these additional claims.

An injunction will be entered separately.