William E. BROCK, Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,

v.

MR. W FIREWORKS, INC., Defendant-Appellee.

No. 86–2170.

United States Court of Appeals, Fifth Circuit.

April 20, 1987.

Katherine Waldbauer, Linda Jan S. Pack, Washington, D.C., for plaintiff-appellant.

Norman B. Smith, Greensboro, N.C., L. Bruce Fryburger, San Antonio, Tex., Smith, Patterson, Follin, Curtis, James & Harkavy, Greensboro, N.C., for defendant-appellee.

Before GOLDBERG, RUBIN and POLITZ, Circuit Judges.

GOLDBERG, Circuit Judge:

In 1983, the Secretary of Labor (Secretary) brought suit against Mr. W Fireworks, Inc. (Mr. W), alleging continuing violations since 1980 of the recordkeeping, minimum wage, and overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (FLSA or Act). The only question presented in this appeal is whether the operators of Mr. W's fireworks stands are "employees" within the meaning of the FLSA.

In 1938, Congress passed the FLSA in order to palliate the grave economic ills then ailing our nation. The treatment prescribed is relatively simple—mandatory minimum wages to ameliorate depressed earnings, and overtime penalties to induce shorter working hours. Before ordering putative employers to swallow the congressional pill, however, courts must first ensure that the relevant business suffers from an FLSA illness, *viz.*, that the etiology derives from actual employees, and thus that the Secretary is not a legal hypochondriac.

This FLSA diagnosis is not always easy to perform; congressional intent requires inquiry into the myriad symptoms manifested. There are no neat diagnostic formulas, only rough guidelines and checklists to determine employee status. After scrutinizing various factors through our judicial microscope—no one of which is independently determinative—we must discover whether the alleged employees, as a matter of "economic reality," are "economically dependent" on the business to which they supply their labor and services. Courts must not be overly cautious or tentative in reaching this diagnosis, for Congress intended the Act's prescriptive scope to be expansive.

Following a three day bench trial, the district court determined that Mr. W's operators were not employees under the Act. Having carefully examined the record, we reverse.

I. The Standard of Review of Determinations Regarding Employee Status

The legal standards that determine employee status under the FLSA illuminate the proper standards of review of the district court's determination. We have generally, though not always, employed a five part test, derived from *United States v. Silk*, 331 U.S. 704, 715, 67 S.Ct. 1463, 1469, 91 L.Ed. 1757 (1947): (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the putative employee and employer; (3) the degree to which the "employee's" opportunity for profit and loss is determined by the "employer"; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *See, e.g., Usery v. Pilgrim Equipment Co.*, 527 F.2d 1308, 1311 (5th Cir.), *cert. denied*, 429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976); *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 666 (5th Cir.1983). These factors are not exhaustive, nor can they be applied mechanically to arrive at a final determination of employee status. Rather, they must always be aimed at an assessment of the "economic dependence" of the putative employees, the touchstone for this totality of the circumstances test. *See, e.g., Robicheaux*, 697 F.2d at 665 (focus is "whether the employees 'as a matter of economic reality are dependent upon the business to which they render service.' ") (quoting *Mednick v. Albert Enterprises, Inc.*, 508

F.2d 297, 299 (5th Cir.1975) (quoting *Bartels v. Birmingham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 1550, 91 L.Ed. 1947 (1947)). Moreover, facile labels and subjective factors are only relevant to the extent that they mirror "economic reality." *See, e.g., Goldberg v. Whitaker House Cooperative, Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961).

> No one of these considerations can become the final determinant, nor can the collective answers to all of the inquiries produce a resolution which submerges the dominant factor—economic dependence.... The five tests are aids—tools to be used to gauge the degree of dependence of alleged employees on the business with which they are connected. It is *dependence* that indicates employee status. Each test must be applied with that ultimate notion in mind. More importantly, the final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit.

*Pilgrim Equipment,* 527 F.2d at 1311–12 (citation omitted) (emphasis in original); *see, e.g., Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); *Castillo v. Givens,* 704 F.2d 181, 190 (5th Cir.), *cert. denied,* 464 U.S. 850, 104 S.Ct. 160, 78 L.Ed.2d 147 (1983); *Robicheaux,* 697 F.2d at 666; *Weisel v. Singapore Joint Venture, Inc.,* 602 F.2d 1185, 1189 (5th Cir.1979).

There are thus three types of findings involved in determining whether one is an employee within the meaning of the Act. First, there are historical findings of fact that underlie a finding as to one of the five *Silk* factors; for example, whether Mr. W controlled the number of hours that an operator must be at a stand. It is beyond cavil, and neither of the parties dispute, that these findings of historical fact are subject to the clearly erroneous rule of Federal Rule of Civil Procedure 52(a).

■ Second, there are those findings as to the *Silk* factors themselves. The Secretary argues that these are mixed questions of fact and law, subject to plenary review. Mr. W asserts that these are questions of fact, subject to the clearly erroneous rule. We agree with Mr. W. Findings as to control, investment, skill and initiative, opportunity for profit and loss, and permanency are plainly and simply based on inferences from facts and thus are questions of fact that we may set aside only if clearly erroneous. *See Icicle Seafoods, Inc. v. Worthington,* —— U.S. ——, 106 S.Ct. 1527, 1529, 89 L.Ed.2d 739 (1986) ("the facts necessary to a proper determination of the legal question whether an exemption to the FLSA applies in a particular case should be reviewed by the Courts of Appeals pursuant to Rule 52(a)"); *Castillo,* 704 F.2d at 185; *Donovan v. DialAmerica Marketing, Inc.,* 757 F.2d 1376, 1383 (3d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985); *cf. Pullman-Standard v. Swint,* 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982) (intentional discrimination under Title VII is a finding of fact subject to the Rule 52(a) clearly erroneous standard of review).

■ Two caveats are necessary, however. Although we may only set aside factual findings of the district court if we have a firm and definite conviction that a mistake has been made, *United States v. United States Gypsum Co.,* 333 U.S. 364, 394, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948), this must not serve as an excuse to avoid comprehensively canvasing the record with great care. *See Parker v. Mississippi State Dept. of Public Welfare,* 811 F.2d 925, 929–30 (5th Cir.1987). For us to do otherwise, would abrogate our role and duty as a reviewing court. *See Anderson v. Bessemer City,* 470 U.S. 564, 581, 105 S.Ct. 1504, 1515, 84 L.Ed.2d 518 (1985) (Powell, J., concurring). Congress surely did not intend Rule 52(a) to constrict as a Victorian corset, binding the courts of appeals to the findings of the district court absent a careful and fitting examination. Second, we must ensure that the factfinding of the district court is performed with the proper legal standards in mind. Only then

can the inferences that reasonably and logically flow from the historical facts represent a correct application of law to fact. The district court's analysis, of course, is subject to plenary review by this court, to ensure that the district court's understanding of the law is proper. *See Icicle Seafoods*, 106 S.Ct. at 1530.

■ Finally, the district court must reach an ultimate conclusion that the workers at issue are "employees" or "independent contractors." The Secretary urges that this is a legal conclusion, subject to plenary review. Mr. W, however, argues that this finding also is an inference from fact, subject to the clearly erroneous rule. Here, we agree with the Secretary. The ultimate finding as to employee status is not simply a factual inference drawn from historical facts, but more accurately is a legal conclusion based on factual inferences drawn from historical facts. We thus have held repeatedly that the ultimate determination of employee status is a finding of law subject to *de novo* consideration by this court. *See Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1327 & n. 24 (5th Cir.1985) (citing and reconciling cases).

Mr. W, however, argues that we are not bound by *Beliz*, because earlier panels of this court have taken a different view as to the proper characterization and scope of review of this finding. *See id.* (citing cases to be reconciled). Although it is possible that we are not bound by *Beliz*, we believe that its holding is proper and is strongly supported by the recent Supreme Court opinion in *Icicle Seafoods*. There, in discussing the proper standard when reviewing an analogous FLSA question, whether a worker is a "seaman," Justice Rehnquist writing for a unanimous Court plainly indicated that the ultimate conclusion regarding seaman status is a question of law, subject to plenary review by the courts of appeals. 106 S.Ct. at 1529.

In sum, then, both the district court's findings as to the historical facts and its findings as to the five *Silk* factors are subject to the clearly erroneous rule, given a proper understanding of the relevant law. Its determination that the operators are not employees but independent contractors is a legal conclusion, subject to plenary review.

## II. Factual Background and the District Court's Historical Factfindings

Mr. W, a closely-held, family-owned corporation, owns some 100 fireworks stands, which are operated across South Texas. The fireworks business is by nature seasonal, because Texas law permits fireworks to be sold only during a 13–day season culminating on January 1st, and during an 11–day season culminating on July 4th.

Mr. W operates an office and warehouse in Somerset, Texas, a suburb of San Antonio. From its office, Mr. W recruits operators, acquires land for fireworks stands, constructs stands, employs 5 or 6 routemen to supply the stands with fireworks, and advertises.

The district court made no factual findings as to the nature and amount of capital Mr. W has invested in its stands. The record reveals, however, that Mr. W's investment is considerable. It procures land, through lease or otherwise,[1] in order to place the stands. In determining where to locate stands, Mr. W checks local fireworks ordinances, conducts market and demographic surveys, and engages an attorney to negotiate and to enter into leases to secure the property on which stands are to be placed. Mr. W then determines the appropriate stand size, ranging from 24 to 96 feet, for the particular location.

Mr. W procures the necessary materials to build the stands, and hires contractors to construct them at its warehouse. The stands are painted a common color, with a common Mr. W logo, and then transported to the locations selected by Mr. W. Most stands are kept at their sites throughout

---

1. Four or five operators during the relevant period owned the land on which the stand was located. In compensation for the value of their property, they received additional commission relative to the other operators. *See infra* note 3.

the year, but periodically must be returned to the warehouse for regular maintenance.

In addition, Mr. W buys and imports from Asia the fireworks that it supplies to the operators, and pays the salary of its employees stationed at Somerset. Mr. W must procure licenses and insurance for all the stands. It also pays for electrical service at all the stands, and secures newspaper ads both to recruit operators and to increase business. Finally, Mr. W pays the operators themselves.

As to the operators, the district court found that "[w]hile [Mr. W] did reimburse the[m] ... for some of their advertising and other expenses, many operators, in particular those who were most successful, invested their own money in the business-es." Op. at 7. The district court specifically found that operators purchased hay, gravel, and pallets. Operators are responsible for trash collection, pay the entire cost of renting a portable toilet,[2] and pay for various devices to improve business conditions, security, and the personal living environment at the stands. The cost of "feeding, housing and paying [the operators'] employees is substantial." *Id.*

The court also found that Mr. W exercises little control over the operators. All the operators signed a standard-form contract with Mr. W that is not subject to modification or negotiation. The initial contracts and rules, which were operative until 1983, "seemingly enabled [Mr. W] to exercise control over the stands by setting hours and prices, and by prohibiting the sale of other merchandise by the operators." *Id.* at 2–3. But these contracts and rules "referred to the operators as independent contractors, and gave them sole control over day-to-day activities." *Id.* at 3. Following an investigation by the Wage & Hour Division of the Department of Labor in 1983, Mr. W (at the behest of its attorney) modified both the contract and the rules. The hours of operation (9:00 a.m. to midnight) were "suggested," and the prohibition against selling other merchandise was for-mally eliminated. In any event, the district court found, "[t]here is no evidence that [Mr. W] enforced any rule or regulation against any [operator]." *Id.* at 6.

Rather, "[a]fter [Mr. W] placed a[n] [operator] in business, by arranging for the stand and initial inventory, the [operator] took charge and controlled all aspects of the business." *Id.* "[E]ven though the early contracts and rules reserved the *right* of control, there was virtually no evidence that [Mr. W] ever *exercised* this control over operators." *Id.* at 4 (emphasis in original). Although price tags and a suggested price list accompanied deliveries of initial inventory, "the operators considered these to be suggested prices only, and felt free to change them, which they sometimes did." *Id.* at 4–5. Similarly, "[a]lthough the initial inventory came with suggested display instructions, the operators could and did alter the display." *Id.* at 5. Most operators controlled their own hours, but "[t]he operators are advised that, in accordance with state law, the stands must be attended 24 hours per day." *Id.* Finally, the operators perform "many improvements" on the stands, engage in independent advertising, sell merchandise other than Mr. W fireworks, and exercise sole control over hiring, supervising, and paying the helpers that they "employ" to work at the stands. *Id.* Thus, the district court found that neither the rules nor the contract are enforced by Mr. W, and that the operators exercise control over the business.

The court next determined that the operators have extensive opportunities for profit and loss. The operators are paid a 15% commission on fireworks sold.[3] The operators' commission is calculated by subtracting the cost of merchandise returned at the end of the season to Mr. W by the operator from the merchandise Mr. W delivers to the operator, then by computing 15% of this difference, less state and local sales taxes. The base price of the inventory

---

**2.** For a few years during the relevant period, Mr. W paid one-half of the cost of renting portable toilets.

**3.** Mr. W paid the few operators who owned the land on which the stand was located a 25% commission. *See supra* note 1.

difference is Mr. W's "suggested" retail price. Because all merchandise not returned is assumed to have been sold (at the suggested list price), the operator is held responsible for all losses due to theft and other causes. Indeed, the record shows that one operator sustained a loss of $3,000, and another had an inventory loss of $1,800. Thus, the district court determined that the operators are "susceptible to a substantial loss[,] [and] it is unlikely that a[n] [operator] would accept this risk of loss without the opportunity to make a large profit." *Id.* at 7.

The court conclusively found that the operators "display initiative to increase business." *Id.* "[W]hile no particular skill [i]s necessary to open a stand, prior experience in sales and as a supervisor would be helpful." *Id.* at 8. Additionally, experience in selling fireworks directly correlates with proficiency and profits.

Finally, the district court found that the operators do not have a "permanent" relationship with Mr. W, because of the seasonal nature of the business. Because the fireworks business is not their primary source of income, the operators are not "economically dependent" on Mr. W for subsistence. The trial court thus concluded that the operators are "independent contractors," not "employees."

### III. Review of the District Court's Application of the *Silk* Factors

The district court properly identified the five *Silk* factors in making its analysis. But after carefully canvassing the entire record, we are firmly and definitely convinced that the court's findings as to several important historical facts are mistaken, as are the inferences drawn therefrom. In addition, the court employed the wrong legal standard in drawing several inferences, and considered several factors that are legally irrelevant to a determination of employee status.

### A. Control

The district court determined that the operators are "able to operate the stands and d[o] operate the stands independently of" Mr. W. Several of the court's historical findings are clearly wrong, and others are irrelevant as a matter of law. We therefore hold that the district court's finding as to control is clearly erroneous.

The court first found that, although Mr. W supplies the operators with a list suggesting the retail price and with preprinted price tags, the operators can and do change the prices. This finding simply is not supported by the record. In addition, as the district court recited but failed to apply, it is not what the operators *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive. *Brennan v. Partida,* 492 F.2d 707, 709 (5th Cir.1974) ("It is not significant how one 'could have' acted under the contract terms. The controlling realities are reflected by the way one actually acts."); *Pilgrim Equipment,* 527 F.2d at 1308; *see Tony & Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 299–302, 105 S.Ct. 1953, 1961, 1962, 85 L.Ed.2d 278 (1985).

Three operators testified that they usually followed Mr. W's suggested retail prices, but that they *occasionally* reduced prices to repeat customers who bought fireworks in high volumes. Ten operators unequivocally testified, however, that they never deviated from Mr. W's retail prices, and that they used Mr. W's price tags to mark the prices of the merchandise. Moreover, many of these ten operators indicated that, as a result of the contract, they felt compelled to adhere to Mr. W's "suggested" prices. The district court does not indicate in its findings that the testimony of the ten operators who adhered to Mr. W's "suggested" prices was less credible than that of the three who deviated. Although the testimony of the three operators arguably indicates that they *could* alter prices in the fashion of an independent businessperson, their own testimony indicates that they rarely did so. The other testimony establishes that most operators did not ever deviate from Mr. W's "suggested" prices. Therefore, we must conclude that, as a matter of economic reality, Mr. W exercises extensive control over the prices charged

by the operators for the fireworks. The district court's findings of fact to the contrary are clearly erroneous.

The court also concluded that "most operators controlled their own hours." Op. at 5. The court noted that several operators testified to having maintained hours from 9:00 a.m. to midnight in order to conform to their understanding of the contract, but that "no one was ever sanctioned for opening late or closing early." *Id.* We cannot say that this finding as to the hours of *business operation* is clearly erroneous, but it ultimately has little to do with Mr. W's control over the hours that the operators actually *worked.*

The district court erroneously found that the operators are required to attend the stand twenty-four hours a day to comply with the Texas regulatory scheme. All operators who testified stated that they were present at the stand after "business hours" to comply with this regulation. The district court characterized this requirement as mandated by state law, and thus implicitly *not* mandated by Mr. W. But in fact state law makes no such requirement. State law only mandates "that fireworks stands used for overnight storage of fireworks must be equipped with suitable locking devices to prevent unauthorized entry." Brief for Appellee at 5; *see* Texas Board of Ins. Rules and Regulations, Rule 059.41.-592(b). It inescapably follows that it is Mr. W, not state law, that requires the *operators* (or their helpers) to attend the stands twenty-four hours a day. As a matter of economic reality, therefore, Mr. W exercises great control over the hours of the operators.

The court next found that, although the operators received instructions for displaying merchandise when Mr. W delivered their initial inventory, the operators "could and did alter the display." Op. at 5. On reading the record, we hold that this finding also is clearly erroneous. Six operators unequivocally testified that they followed Mr. W's display instructions to the letter; only one testified that he did not follow them.

The court also found that because "*many* operators, on their own to increase their business and thus their commission, advertised on radio, in the newspaper, with signs and by distribution of flyers," the operators exercised such control as to indicate that they functioned independently of Mr. W. *Id.* (emphasis added). Mrs. Wildman, the treasurer, bookkeeper, and part owner of Mr. W, testified to knowing of only eight instances of independent advertising by operators over the past five years. One operator testified that he placed an advertisement in the newspaper. But he also testified that he was reimbursed by Mr. W. This same operator testified that he was given *free* radio time by a local station. Another operator testified that, for three of the six seasons she was affiliated with Mr. W, she purchased $70 worth of radio advertisements. Only four operators testified to placing a few signs to attract business. Crediting Mrs. Wildman's testimony, the most one could possibly infer on this record is that eight of a possible 100 operators per season for ten seasons, engaged in independent advertising. Therefore, contrary to the finding of the district court, we conclude that the overwhelming majority of operators did *not* engage in independent advertising.

Other findings of the district court, though not clearly erroneous, either are legally irrelevant to a finding of control or are of insufficient weight to overcome those factors previously discussed, which indicate Mr. W's control over the operators. The district court found that the operators "performed many improvements on the premises[,] such as painting, mowing, displaying of lights, and building fences." *Id.* While this finding accurately reflects the record, it is not probative of control and, ultimately, of economic dependence. It is true that *some* operators made *some*, but not many, improvements. But the record also establishes that *most* operators made *few* or *no* such improvements. The record shows that three operators mowed the grass around their stands, one operator built a fence, one operator painted the interior of the stand, and one operator, without being reimbursed by Mr. W, erected lights.

Thus, the record falls far short of showing that most or even many of the some 1000 operators made improvements to the stands during the relevant period without reimbursement by Mr. W.

The district court correctly noted that "[t]here was ... evidence that other merchandise, including fireworks not distributed by ... [Mr. W] (which appeared in the final inventory), were sold at the stands." *Id.* Mrs. Wildman testified that some operators sold other brands of fireworks, and that she knew of four operators who had sold Christmas trees, watermelons, or "UFOs" (styrofoam kites). But Mrs. Wildman did not testify as to the *extent* of sales of items other than Mr. W fireworks, and the testimony of the operators revealed that the sales of other merchandise were at most *de minimis*. Only two operators testified that they had sold merchandise other than fireworks. One testified that he purchased Christmas trees two days prior to Christmas and was able to sell a few at twenty-five *cents* a piece. Another operator testified that he sold popcorn, citrus fruit, and pecans at the stand. The sale of such incidental items simply is irrelevant as a matter of law. "These sales minimally supplemented their income. [But] [s]uch minor additional income made from work which is not connected with the actual business under examination is not relevant to a court's determination of employee status." *Pilgrim Equipment,* 527 F.2d at 1313 (citing *Partida,* 492 F.2d at 709). Further, the testimony of the operators does not suggest that they received *any* supplies of fireworks from suppliers other than Mr. W; they testified only to receiving supplies from Mr. W's routemen, or to picking them up themselves at the Somerset warehouse. Thus, it is indubitably clear that Mr. W, as prescribed in its initial contract, as a matter of economic reality controlled the merchandise that the operators sold at the stands.

Finally, the court noted accurately that several operators testified that they would not have accepted the job but for the fact that they were paid on commission; "they would not have worked at the stand for an hourly wage." Op. at 6. The method of payment, however, is legally irrelevant to a finding of control, or to any other finding relating to employee status. *See United States v. Rosenwasser,* 323 U.S. 360, 362–64, 65 S.Ct. 295, 296–97, 89 L.Ed. 301 (1945). The subjective feelings of the operators regarding their prefered method of payment are equally irrelevant. There is neither a logical nor legal nexus between the operators subjective desires regarding their prefered method of payment and a finding of their employment status. Subjective beliefs cannot transmogrify objective economic realities. "A person's subjective opinion that he is a businessman rather than an employee does not change his status." *Robicheaux,* 697 F.2d at 667.

Mr. W controls the location and size of the stands, the fixing of prices, the merchandise sold, the display of the merchandise, the hours that operators must attend the stands, most of the advertising, and the method of paying the operators. It is true, as the district court noted, that the operators have the sole authority to hire their own employees and to set their wages and hours. But "[i]n the total context of the relationship neither the right to hire employees nor the right to set hours indicates such lack of control ... as would show these operators are independent...." *Pilgrim Equipment,* 527 F.2d at 1313; *see Mednick,* 508 F.2d at 301; *Castillo,* 704 F.2d at 190; *Real v. Driscoll Strawberry Associates,* 603 F.2d 748, 755 (9th Cir.1979).

> The most significant conclusion from all these facts is that the operators cannot exert control over any aspect of their business lives independent[ly]. ... They have no viable economic status that can be traded to other ... companies [in the same business] and the lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence. Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity.

*Pilgrim Equipment,* 527 F.2d at 1312–13. The entire record clearly and unmistakeably demonstrates that all "meaningful"

aspects of this business are controlled by Mr. W and that the operators are economically dependent on Mr. W. Indeed, the operators could not function without Mr. W. We, therefore, have a definite and firm conviction that Mr. W controlled the operators. The finding of the district court to the contrary is clearly erroneous.

B. Opportunity for Profit and Loss

The district court found that the operators had significant independent opportunities for profit and loss, indicating that they were independent contractors, not employees. This finding is clearly erroneous as well.

The court found that the operators could affect their "profits" by placing advertisements, controlling prices, and improving management and sale techniques. The court found that "[t]he more experienced operators learned that courtesy to customers and the neat appearance of the stand were important to attract more business, as was knowledge of what fireworks do." Op. at 6. Finally, after noting that one operator "showed a cash loss of approximately $3,000 ... and one [operator] an inventory loss of approximately $1,800," the court determined that "[a]n employee would not be held responsible for such losses. It is unlikely that a[n] [operator] would accept this risk of loss without the opportunity to make a large profit." Id. at 7.

Contrary to the district court's findings, we have already held that Mr. W controlled the prices at which the operators sold the fireworks and, in large part, the advertising. Second, although experience and courtesy to customers may to some degree enhance an operator's commission, this is equally true of all commissioned employees and of employees earning gratuities. See Rutherford Food Corp., 331 U.S. at 729, 67 S.Ct. at 1476, 91 L.Ed. at 1778; Mednick, 508 F.2d at 301. Third, the record shows that the location and size of the stand—controlled by Mr. W—looms large in determining the amount of commission earned.

The opportunities for profit and loss in this case are remarkably similar to the opportunities for profit and loss in Pilgrim Equipment, 527 F.2d at 1313:

The lower court concluded that the opportunities for profit or loss were the same as in any independent business. The major determinants of profit which an operator could make, however, were directly controlled by Pilgrim. Since the operators were paid on a percentage basis, the amount of business done by an operator governs total profit. The lower court found that convenience of hours, extra service provided, and rapport with customers were factors which affected profits and were within the control of each operator. However, price, location, and advertising—determinants of customer volume at least as vital as those governed by the operators—are regulated by Pilgrim.

The lower court attempted to distinguish Pilgrim Equipment by noting that operators bear the risk of losses due to theft. But this case is on all fours. As we noted in Pilgrim Equipment, the operators cannot negotiate regarding the terms of their compensation, and thus "that the operators accept responsibility for bad-check and theft losses does not show independence. Rather it shows ... [the alleged employer] chose to place this added burden on its operators." Id. at 1313; see Mednick, 508 F.2d at 301; Donovan v. Sureway Cleaners, 656 F.2d 1368, 1369-70 (9th Cir.1981). Mr. W unilaterally established the operators' rate and means of compensation; the standard form contract establishing the operators' responsibility for losses was drafted and presented by Mr. W without any opportunity for negotiating its terms. That two of 1000 operators during the relevant period sustained substantial paper losses cannot distinguish this case from Pilgrim Equipment. The "losses," moreover, were not real losses, only reductions in the amount of sales for which an operator could earn commission.

Additionally, the vast majority of operators made only minor investments in the business, see infra at 1051-52. For the most part, the operators' only " 'expenditures' from which the[y] ... obtain a return is [on] their own labor...." Such returns are more properly "classified as wages, not profits." By contrast, " '[p]rofit' is the gain

realized from a business over and above its [capital] expenditures." *Brock v. Lauritzen*, 624 F.Supp. 966, 969–70 (E.D.Wis.1985) (quoting *Silent Women, Ltd. v. Donovan*, 585 F.Supp. 447, 451 (E.D.Wis.1984); *see Mednick*, 508 F.2d at 301.

Thus, the record reveals that these operators are far more closely akin to wage earners toiling for a living, than to independent entrepreneurs seeking a return on their risky capital investments. We therefore hold that the opportunity for profit and loss is controlled mainly by Mr. W, and that this factor points to economic dependence.

### C. Investment

The district court found that "many operators, in particular those who were most successful, invested their own money in the businesses." Op. at 7. In drawing this inference, the court made many findings of fact that are clearly erroneous, employed the wrong standard of law, and considered several factors that are legally irrelevant. Finally, the court erred as a matter of law by failing to make findings as to the absolute and relative investment of Mr. W compared to that of the operators, before concluding that the operators' investments indicated economic independence from Mr. W.

In particular, the court found that operators

> purchased hay, gravel, and pallets to cover muddy areas around the stand, and were responsible for trash collection.... [T]he operators now pay the entire cost [of a portable toilet]. [Operators] pay for campers, trailers or tents they use as sleeping quarters at the stand, security systems, cash registers, computers, adding machines, "bug zappers", calculators, fans, heaters, office supplies, "beepers", telephones, insect repellent, paint and lights. The expense of feeding, housing and paying employees is substantial and is solely the responsibility of the [operator].

Op. at 7.

Mrs. Wildman testified that she knew of one stand that had utilized pallets, and of none that had used hay. Two operators testified that they purchased hay, gravel and pallets—at a cost of $25 to $30—without being reimbursed by Mr. W. (One operator testified that he also made such purchases, but that Mr. W reimbursed him). Two operators testified that they purchased bug lights without reimbursement, at eight to ten dollars; another operator made such purchases, but Mr. W reimbursed him. Three operators purchased several cans of bug repellant—from three to six cans at a price of two to four dollars—without reimbursement. Two operators purchased a "bug zapper." One operator testified that he purchased a security system for the stand at a price of $85 to $90, and used a family pet as a watchdog. Four operators testified that they leased toilets, which ranged in price from $28 to $72 per season. Two operators testified that they incurred some expenses in trash removal. Three operators testified that they used cash boxes or registers, but one acquired a wooden cash box without cost, and another brought a cash box from home. Three operators testified that they purchased fans for the stand, but they also used the fans at home. Similarly, while two operators used portable heaters at the stand, one operator brought in a heater from home. One operator testified that he used a computer to assist him while working at the stand, but this involved no investment because he originally had purchased the home computer for school work. Five operators testified that they purchased one or more calculators (several more were brought from home), at a total cost ranging from $31 to $150. Two operators testified to purchasing office supplies; one invested seven dollars, the other $25. In addition, one operator purchased lights without being reimbursed, and one operator purchased paint with which to paint the interior of the stand. Finally, three operators testified that they arranged to have telephones installed, and one operator testified that he had a beeper; both the telephones and the beeper were acquired for the purpose of making personal calls and receiving personal messages.

Given this record, it is difficult to understand the legal significance of the district court's true but nebulous finding that some operators invested in such items. These few, minor purchases, often for nonbusiness purposes, do not indicate legally significant investment by the operators. *Most* operators did not engage in such investments, and for the few who did, with a few exceptions, the cost was minimal. Indeed, the record establishes the opposite of what the district court's finding suggests. The fact that a few operators engage in minimal investments has little legal relevance, when the overwhelming majority of the risk capital is supplied by Mr. W. *See, e.g., Pilgrim Equipment,* 527 F.2d at 1324; *Beliz,* 765 F.2d at 1328; *Real,* 603 F.2d at 755.

It is true, as the court pointed out, however, that nearly every operator testified to sleeping in a sleeping bag, trailer or recreational vehicle while attending the stand at night. This is hardly surprising, since the record also shows that the operators were required by Mr. W to spend the night at the stands. Thus, it is simply bootstrapping to say that this indicates a substantial investment on the part of the operators. *See Pilgrim Equipment,* 527 F.2d at 1313; *Mednick,* 508 F.2d at 301; *Sureway Cleaners,* 656 F.2d at 1369–70.

Second, and of equal importance, only one operator claimed to have purchased a recreational vehicle solely for the fireworks business, and only one operator claimed to have rented a trailer for the season. At least ten operators who testified that they slept in sleeping bags or recreational vehicles purchased these items prior to becoming operators, and used such items for family recreational purposes as well as for the fireworks business.

Finally, the court found that "[t]he expense of feeding, housing and paying the employees is substantial and is solely the responsibility of the" operator. Op. at 7. There is simply no evidence in the record that the operators incurred any responsibility or expense for housing their employees, and only one operator testified that he paid to feed his helpers. It is true, however, that some operators incurred costs in paying their helpers. But this fact is not dispositive. *Pilgrim Equipment,* 527 F.2d at 1312; *Mednick,* 508 F.2d at 301. The majority of paid helpers, as the district court found, were simply family members of the operators, and the duration and terms of their "employment" is less than clear in the record.

Mr. W further argues on appeal that because as a matter of Texas law title to merchandise under consignment passes to the consignee, the operators "owned" the fireworks, and thus that the operators "incur[red] major investments for their inventory." Brief for Appellee at 26 & n. 2. Irrespective of the validity of this statement of Texas law, a question we need not address, it has no relevance to the economic realities. The simple fact is that operators receive merchandise from Mr. W without having to pay a penny up-front, and that they can return all the merchandise unsold without ever having to pay Mr. W. The formal label that Texas law attaches to the transaction is irrelevant—economic realities control.

The operators' relative investment must be compared with the investment of Mr. W in order to determine the degree of economic dependence. *See, e.g., Pilgrim Equipment,* 527 F.2d at 1314; *Castillo,* 704 F.2d at 192; *Real,* 603 F.2d at 755. The record indicates that Mr. W assumes the sole cost of providing the stands, the licenses, insurance, land on which the stands are erected, electricity for the stands, inventory for the stands without any "up-front" money by the operators, routemen to supply the stands, and advertising. The lower court failed to take into account Mr. W's considerable investment in the business before finding that the degree of investment indicates that the operators are more akin to independent contractors with respect to investment. This finding is clearly erroneous.

Further, the court's finding that "[t]hough many [operators] made little or no investment, the opportunity to invest and increase profit certainly existed" is both clearly erroneous and derived with the

wrong legal standard in mind. The court erred by considering the *opportunity* to invest; only the economic realities are legally relevant. *See, e.g., Pilgrim Equipment*, 527 F.2d at 1308. Similarly, the court's finding that the operators closed their stands at the end of the season without being compensated by Mr. W is wholly tautological and legally irrelevant. As we have been compelled to point out *ad nauseum*, Mr. W unilaterally prescribed the terms of the operators' compensation. *Pilgrim Equipment*, 527 F.2d at 1313; *Mednick*, 508 F.2d at 301; *Sureway Cleaners*, 656 F.2d at 1369–70.

Thus, having reviewed the entire record, we are left with no doubt that "[b]ut for [Mr. W's] provision of all costly necessities, these operators could not operate. Their total dependency upon [Mr. W] is confirmed rather than denied by these facts." *Pilgrim Equipment*, 527 F.2d at 1314.

### D. Skill and Initiative

The district court correctly found that most operators had no prior experience selling fireworks. The court, however, also found that "while no particular skill was necessary to open a stand, prior experience in sales and as a supervisor would be helpful." "[T]he more experience a[n] ... operator gained ... the more proficient he became in organizing the business to maximize profit." Thus, the court determined that "[u]nlike the persons in *Usery* [v. Pilgrim Equipment Co.,] the [operators] here did display initiative to increase business." Op. at 8. This finding of the lower court is clearly erroneous. The record here unmistakeably reveals, that in regard to skill and initiative, this case and *Pilgrim Equipment* are as similar as Castor and Pollux.

The record establishes that the most important skill that an operator could garner to enhance his or her success is the ability to develop and to maintain rapport with customers. Thus, the district court misread *Pilgrim Equipment*. In that case, we held that initiative, not efficiency, determines independence, and that "customer rapport is not an 'initiative' characteristic." Rather, it "much more closely parallels 'ef-

ficiency.' " 527 F.2d at 1314; *see Rutherford Food Corp.*, 67 S.Ct. at 1477. The district court, therefore, labored under an incorrect understanding of the law.

We hold that the operators did not exhibit sufficient independent skill or initiative to indicate that they were independent contractors. As we reasoned in *Pilgrim Equipment*, 527 F.2d at 1314, "[r]outine work which requires industry and efficiency is not indicative of independence and nonemployee status." Indeed,

> [t]hese operators are unable to exert initiative in the operation.... All major components open to initiative—advertising, pricing, and most importantly the choice of ... [fireworks' suppliers] with which to deal are controlled by ... [Mr. W]. Much emphasis was placed on ... the need for rapport with customers. Customer rapport is not ... "initiative...." But to the extent it requires "initiative," it is significantly controlled or at least continuously encouraged by ... [Mr. W] through the commission-rate payment arrangement. The operators received a percentage of the money paid for each item ... [sold]. Obviously, encouraging repeat customers enhances financial reward under this payment scheme.
>
> ... The skills required in th[is] operation ... are valuable. But many successful employees need these same abilities and perform similar tasks. The bottom line in this enterprise is the business acumen and investment contributed by ... [Mr. W].

*Id.* at 1314–15.

### E. Permanence

Because the fireworks business is by nature seasonal, and because "[t]here is a turnover of ... operators of approximately 80%," the district court found that the relationship between Mr. W and its operators was not permanent, indicating that the operators were independent contractors. Op. at 8. Because the district court again labored under a misunderstanding of the applicable law, its finding is clearly erroneous.

We have often found seasonal workers to be "employees" within the meaning of the Act. *See, e.g., Beliz,* 765 F.2d at 1329; *Castillo,* 704 F.2d at 188–93. We have held, moreover, that in applying the *Silk* factors courts must make allowances for those operational characteristics that are unique or intrinsic to the particular business or industry, and to the workers they employ. *Mitchell v. John R. Cowley & Bro., Inc.,* 292 F.2d 105, 108 (5th Cir.1961); *see DialAmerica Marketing,* 757 F.2d at 1384. Seasonal workers are by nature peripatetic. We thus hold that when an industry is seasonal, the proper test for determining permanency of the relationship is not whether the alleged employees returned from season to season, but whether the alleged employees worked for the entire operative period of a particular season. *See Donovan v. Brandel,* 736 F.2d 1114, 1117 (6th Cir.1984); *Mendez v. Brady,* 618 F.Supp. 579, 582 (W.D.Mich.1985).

The record establishes beyond cavil that every operator who ever worked for Mr. W labored through the entire fireworks season. This factor, therefore, clearly points to a holding that the operators are "employees."

### IV. Economic Dependence and Employee Status

The district court concluded that permanence was "the most important of all" the indicia, and that "[e]conomic dependence is totally absent in this case." The court reasoned that, because the fireworks business is seasonal, the operators rely on earnings from the "family-operated businesses" only "to make extra money in [their] spare time." Op. at 8, 9. In sum, the court reasoned that the operators were not economically dependent on Mr. W, but were independent contractors because "none of the [operators] make a living selling fireworks." *Id.* at 9. This ultimate conclusion is wrong as a matter of law.

First, the court erred by singling out the (erroneous) finding regarding impermanence and by focusing on the operators' lack of reliance on Mr. W for subsistence to conclude that there was a lack of "econom-

ic dependence." Economic dependence cannot be determined by reference to any one or two factors. Rather, all the *Silk* factors must be considered and used as a guide. It is axiomatic that economic dependence is not an independent variable with a life of its own—it can only be determined in conjunction with consideration of the economic reality of all the relevant circumstances. *See, e.g., Bartels,* 67 S.Ct. at 1547; *Rutherford Food Corp.,* 67 S.Ct. at 1477; *Pilgrim Equipment,* 527 F.2d at 1311; *Castillo,* 704 F.2d at 190; *Robicheaux,* 697 F.2d at 666; *Donovan v. Tehco, Inc.,* 642 F.2d 141, 143 (5th Cir.1981); *Sureway Cleaners,* 656 F.2d at 1368; *Real,* 603 F.2d at 754. In sum, "[i]t is erroneous to focus on a single factor ... and thereby fail to consider the entire circumstances of the work relationship." *Partida,* 492 F.2d at 709 (citations omitted).

In addition, the court's understanding of the meaning of "economic dependence" is itself flawed. Economic dependence is *not* conditioned on reliance on an alleged employer for one's primary source of income, for the necessities of life. Rather, the proper test of economic dependence mandates consideration of all the factors, and in light of such consideration "examines whether the workers are dependent on a particular business or organization *for their continued employment*" in that line of business. *DialAmerica Marketing,* 757 F.2d at 1385 (citing *Pilgrim Equipment,* 527 F.2d at 1311) (emphasis added).

■ Even disregarding these mistakes, indeed even were employee status a question of fact subject to the clearly erroneous standard of review, we would be compelled to find these operators to be employees. Mr. W controls the salient aspects of the operation, the operators, the terms of the operators' compensation, and the degree to which the operators could independently affect profit and loss. Mr. W supplies nearly all the risk capital, and little initiative is required to be an operator. The operators are permanent employees. All the *Silk* factors, therefore, demonstrate that these operators are economically dependent on Mr. W. The operators have no

independent business organization that they could market and transfer from employer to employer. *See, e.g., Hickey v. Arkla Industries, Inc.,* 699 F.2d 748, 752 (5th Cir.1983) (on petition for rehearing); *DialAmerica,* 757 F.2d at 1385; *Sureway Cleaners,* 656 F.2d at 1372. "[T]here is no operator who, as an economic entity, is capable of doing business elsewhere." *Pilgrim Equipment,* 527 F.2d at 1315. These operators are employees of Mr. W—they are not in business for themselves.

Mr. W argues in the alternative, however, that its stands are exempt from coverage under the Act as "amusement or recreational" establishments, *see* 29 U.S.C. § 213(a)(3), or that the operators, even if employees, fall within the "outside salesman" exemption to the Act, *see* 29 U.S.C. § 213(a)(1). We express no opinion regarding these contentions. Because the district court did not have occasion to address them in the first instance, and because they were not fully briefed by the parties, we decline the invitation to consider these arguments initially on appeal. The case is thus REVERSED and REMANDED for further proceedings consistent with this opinion.