KING, Circuit Judge,
concurring in part and dissenting in part:
I agree with the district court that the evidence proffered by the Secretary of Labor on damages was deficient and-1 would therefore affirm the district court’s take-nothing judgment. I disagree, however, with the district court’s decision, affirmed by the majority, that Express’s drivers are independent contractors, and I therefore respectfully dissent from the majority’s decision to affirm the denial of an injunction ordering prospective compliance with the minimum wage, overtime compensation and recordkeeping requirements of the Fair Labor Standards Act.
I agree with and applaud the majority’s conclusion that two of the district court’s findings of fact are clearly erroneous — the finding regarding the relative investment of the worker and the employer and the finding regarding the skill and initiative required by the worker. But I also would hold clearly erroneous the district court’s finding regarding the degree to which the worker’s opportunity for profit or loss is determined by the employer. In my opinion, this factor also weighs in favor of employee status. Further, in view of the entirety of the circumstances, I would hold that Express’s drivers are employees rather than independent contractors.
Although the district court’s findings in connection with each of the Silk factors are reviewed for clear error,
we must ensure that the factfinding of the district court is performed with the proper legal standards in mind. Only then can the inferences that reasonably and logically flow from the historical facts represent a correct application of law to fact. The district court’s analysis, of course, is subject to plenary review by this court, to ensure that the district court’s understanding of the law is proper.
Brock v. Mr. W Fireworks, Inc., 814 F.2d 1042, 1044-45 (5th Cir.1987). In order to evaluate the district court’s finding regarding the ability of Express’s drivers to control their opportunity for profit or loss, it is therefore necessary to understand the principles that inform the courts’ evaluation of this *308 factor. The ultimate conclusion as to whether the workers are employees or independent contractors is reviewed de novo. See id. at 1045. I address each inquiry in turn.
A court’s most important task in analyzing the profit or loss factor is to ascertain which party controls the major determinants of the worker’s ability to make a profit. See Reich v. Circle C. Investments, Inc., 998 F.2d 324, 328 (5th Cir.1993); Mr. W Fireworks, 814 F.2d at 1050; Usery v. Pilgrim Equip. Co., 527 F.2d 1308, 1313 (5th Cir.1976). If the employer largely controls these major determinants, this points toward a finding of employee status. On the other hand, if the workers themselves exert substantial control over their ability to profit or over the likelihood that they will suffer loss, they are more like independent contractors. See Circle C. Investments, 998 F.2d at 328; Mr. W Fireworks, 814 F.2d at 1051; Pilgrim Equip., 527 F.2d at 1313.
We have defined “profit” as the “gain realized from a business over and above its [capital] expenditures.” Mr. W Fireworks, 814 F.2d at 1050-51 (alteration in original) (internal quotation omitted); see Silent Woman, Ltd. v. Donovan, 585 F.Supp. 447, 451 (E.D.Wis.1984). Thus, the extent to which the workers have invested capital that is subject to the risk of loss is also relevant. See Mr. W Fireworks, 814 F.2d at 1050-51; Pilgrim Equip., 527 F.2d at 1313. If the workers have sizeable capital investments at stake, they are more akin to “independent entrepreneurs seeking a return on their risky capital investments,” than to employees. Mr. W Fireworks, 814 F.2d at 1050-51; see Pilgrim Equip., 527 F.2d at 1313 (finding that no opportunity for loss of capital investment indicates dependence, and, thus, employee status).
A line of Fifth Circuit precedent has clarified which determinants of profit are most relevant in determining whether a worker’s opportunity for profit or loss is controlled by an employer. Several factors reoccur throughout the case law. In finding that the employer controlled the major determinants of profit in Usery v. Pilgrim Equipment Co., the court emphasized that the employer, an owner of laundry pick-up stations, controlled the prices charged, the location of each store, and the advertising for the business. See 527 F.2d at 1313. The court concluded that these factors outweighed the factors controlled by the operators — the convenience of the hours of operation, extra services provided, and rapport with customers. See id. Moreover, the court refused to find that the operators’ risk of losing their capital investment was significant where the only risk of loss faced was the risk of bad-check and theft losses and it was the employer who placed this burden upon the operators. See id.
Similarly, in Brock v. Mr. W Fireworks, Inc., the court found that the employer, an owner of fireworks stands, controlled the largest determinants of profit — again emphasizing the prices charged, the location of the stands, and the advertising. See 814 F.2d at 1050. The court acknowledged that the factors controlled by the employees — experience and good customer rapport — increased earnings, but did not consider these to be as relevant as the factors controlled by the employer. See id. As in PilgHm Equipment, the court further found that the stand operators were subject to a minimal risk of loss because their capital investment was limited to the burden of bearing bad-check and theft losses, a burden forced upon them by their employer. See id. at 1050-51. The court therefore concluded that the profit and loss factor weighed in favor of employee status. See id. at 1051.
Most recently, in Reich v. Circle C. Investments, Inc., the court found that the employer, a nightclub operator, controlled the determinants of profit or loss to a greater extent than the dancers who worked at the nightclubs because the employer was responsible for advertising, location of the clubs, business hours, maintenance and appearance of facilities, and the refreshments served. See 998 F.2d at 328. These factors controlled customer volume, which, according to the court, was the largest factor that influenced a dancer’s ability to profit. See id. Moreover, in the court’s view, control over customer volume was more relevant in determining profit than the dancers’ initiative, hustle, and costume. See id.
*309 In light of these cases, it is clear that the district court did not properly assess the drivers’ ability to control their profits or losses. The district court found, in essence, that Express’s drivers have control over the hours they work, their efficiency, experience, and skill,[1] and the amount of them commissions.[2] These findings, even if true, are vastly outweighed by Express’s ability to affect the drivers’ profits by exerting control over the volume of customers, the prices charged to the customers, and the number and profitability of the runs assigned to the drivers.
For example, Express can increase its customer base through increasing its advertising, or through altering the prices it charges per run; the more runs that are available, the greater a driver’s ability to profit. Similarly, the prices that Express charges its customers determine the amount of commission that drivers earn. Finally, Express’s dispatchers control the assignment of runs to the drivers. While the dispatchers try to assign runs first to the nearest on-call operator who last received a run, the dispatchers’ ability to make assignments is circumscribed by the location of the drivers and the priority of the delivery. In other words, drivers have limited control over the number of runs they receive because a driver’s location at the time contributes to whether that driver will be assigned a particular run.
Thus, Express, and not its drivers, controls the largest determinants of profit — customer volume, advertising, price, and the assignment of runs. In Pilgrim Equipment, Mr. W Fireworks, and Circle C. Investments, the employer’s ability to control at least these first three factors outweighed, in the court’s view, the workers’ ability to control factors such as experience, efficiency, initiative, and hustle. While an increase in a driver’s hours or efficiency could certainly have a positive impact on the amount of money he or she earns, even the most industrious and efficient driver will not be able to profit if the prices charged (and thus the commissions available) are not significant, if there are few runs available to assign the driver, or if the driver is not in the right place at the right time in order to be offered runs. Drivers lack control over these vital determinants of profit.
Moreover, although not mentioned by the district court in connection with its analysis of this factor, the drivers’ risk of investment loss is small. For the most part, the only investment that the drivers make is in their own labor. See Mr. W Fireworks, 814 F.2d at 1050; Silent Woman, 585 F.Supp. at 451. As recognized by both the district court and the majority, the record indicates that the vast majority of drivers do not invest in vehicles for purposes of their jobs. Rather, they drive their own personal vehicles. Similarly, while Express requires them to bear the cost of the equipment needed to perform their jobs by deducting from the drivers’ *310 paychecks the cost of certain equipment that it supplies to the drivers, such as uniforms, radios and pagers, biohazard bags, and dry ice, the deductions terminate once the drivers leave Express’s employment and they return the equipment to Express. Thus, in comparison to true independent contractors, the workers do not make considerable capital investments subject to the risk of loss if the business fails. Instead, the drivers need only earn enough to pay their “rent” on their Express equipment and their automobile expenses. As discussed above, the largest determinants of whether the drivers will make enough to compensate for these expenses are customer volume, advertising (which affects customer volume), the prices charged (which affect both customer volume and the amount of commission received by the drivers), and the assignment of runs to drivers. Express controls all of these factors, and thus controls the drivers’ ability to profit and the likelihood that they will suffer loss.
In crediting the district court’s findings on this factor, the majority erred. The drivers’ control over such factors as the number of hours they work, their experience,[3] and then-efficiency is not the type of control over profit that is the true mark of an independent contractor. See Rutherford Food Corp. v. McComb, 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); Silent Woman, 585 F.Supp. at 451. While industry, experience, and efficiency can and do impact profit, the work of Express’s drivers more closely resembles “piecework than an enterprise that actually depend[s] for success upon the initiative, judgment or foresight of the typical independent contractor.” Rutherford Food Corp., 331 U.S. at 730, 67 S.Ct. 1473; see Silent Woman, 585 F.Supp. at 452. I would therefore find clearly erroneous the district court’s conclusion that the drivers controlled their opportunity for profit or loss.
With three factors pointing toward a finding of employee status, and considering the totality of the circumstances, I would conclude that these drivers are in fact employees rather than independent contractors. As the courts have consistently held, the central question is whether the workers, as a matter of economic reality, are dependent for their livelihood on their relationship with their employer. See Carrell v. Sunland Constr., Inc., 998 F.2d 330, 332 (5th Cir.1993); Mr. W Fireworks, 814 F.2d at 1043; Robicheaux v. Radcliff Material, Inc., 697 F.2d 662, 666 (5th Cir.1983); Silent Woman, 585 F.Supp. at 450; see also Rutherford Food Corp., 331 U.S. at 730, 67 S.Ct. 1473 (determining whether a worker is an employee “does not depend on ... isolated factors but rather upon the circumstances of the whole activity”). Express’s drivers clearly depend for their livelihood on Express. They are “not specialists called in to solve a special problem, but unskilled laborers who perform[] the essential, everyday chores of [Express’s] operation.” McLaughlin v. Seafood, Inc., 867 F.2d 875, 876-77 (5th Cir.1989). They have invested little more than their labor and, unlike true independent contractors, they lack the ability to grow their business.
United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), and its companion case, Harrison v. Greyvan Lines, Inc., are clearly distinguishable. In concluding that the driver-owners of coal trucks in Silk and moving vans in Greyvan Lines were independent contractors, .the Supreme Court’s analysis relied heavily on the drivers’ *311 investment in the business and the management skills they exercised. It was the drivers’ considerable investment, the risk of loss of that investment, and the drivers’ management of others that properly placed the Silk and Greyvan Lines drivers in the category of independent entrepreneurs seeking a return on their risky investments.
[W]e agree with the decisions below in Silk and Greyvan that where the arrangements leave the driver-owners so much responsibility for investment and management as here, they must be held to be independent contractors. These driver-owners are small businessmen. They own their own trucks. They hire their own helpers. In one instance they haul for a single business, in the other for any customer. The distinction, though important, is not controlling. It is the total situation, including the risk undertaken, the control exercised, the opportunity for profit from sound management, that marks these driver-owners as independent contractors.
Id. at 719, 67 S.Ct. 1463. In comparison, Express’s drivers have a much smaller investment at stake (the family Geo is a far cry from the coal-hauling trucks and moving vans at issue in Silk and Greyvan Lines), and, consequently, are subject to a much smaller risk of loss because they overwhelmingly do not use vehicles purchased for the purpose of becoming a driver. They do not hire their own assistants. They rarely, if ever, work for anyone other than Express. Therefore, they differ considerably from the drivers in Silk and Greyvan Lines. Compare Tobin v. Anthony--Williams Mfg. Co., 196 F.2d 547, 549-50 (8th Cir.1952) (distinguishing Silk, court found truck drivers who hauled lumber were employees rather than independent contractors where truck drivers did not have substantial investment in trucks, and amount they could earn was largely within control of defendant) with Goldberg v. Bellotto, 207 F.Supp. 499, 500 (S.D.Fla.1962) (truckers, who supplied their own tractors and, occasionally, trailers, hired their own assistants, and were authorized to solicit business for defendant, were independent contractors). Express’s drivers are more accurately described as employees dependent for their livelihoods on their employer, and I would so hold and order the district court to grant the requested injunctive relief.

. The district court’s finding that a "driver’s profit or loss is determined largely by his or her skill, initiative, ability to cut costs, and understanding of the courier business,” is clearly erroneous in light of the legal principles discussed above. While a driver's skill, initiative, ability to cut costs, and understanding of the business may certainly contribute to the amount of money that he or she earns, as discussed further infra, by far the larger determinants of the drivers’ ability to profit are the number of runs available to each driver, the number of runs actually offered to each driver, and the price charged per run — all factors controlled by Express. It was clearly erroneous for the district court to overlook these larger determinants of profit or loss.

. A review of the record indicates that the district court erred in finding that "Express drivers can and do negotiate for increased pornmis-sions.” The vast majority of drivers do not negotiate for increased commissions. At the onset of employment, the drivers are given a standard form contract to sign which already contains the commission rates that drivers receive for various runs. Only two of the forty drivers who testified stated that they had negotiated a slightly higher commission than that contained in the standard contract. Moreover, "it is not what the [drivers] could have done that counts, but as a matter of economic reality what they actually do that is dispositive.” Mr. W Fireworks, 814 F.2d at 1047. As a matter of economic reality, Express exerts substantial, if not exclusive, control over the commissions earned by its drivers. Finally, even were the drivers able to negotiate the amount of their commissions, this ability has a negligible effect on their actual profits in light of the fact that it is Express who controls the number and quality of the runs assigned to each driver. A higher percentage commission is meaningless if the drivers receive a limited number of runs to which this higher commission applies. The district court clearly erred in giving weight to this factor.

. The court in Mr. W Fireworks noted that experience is a quality that can enhance the commissions of all commissioned employees and of all employees earning gratuities. See 814 F.2d at 1050. Consequently, the ability to earn more with experience does not distinguish an independent contractor from an employee.
The majority finds relevant the fact that the experienced drivers knew which runs were most profitable. However, this knowledge would be of little use to a driver who was not offered profitable runs. It is undisputed that the drivers had little control over which runs they were offered and could choose only to accept or reject the runs offered. Turning down an unprofitable run would be no guarantee that the driver would be in the right place to receive an offer for a more profitable run, or that the next run offered would be more profitable than the last. In fact, the record reveals that many drivers were reluctant to turn down runs for fear that the dispatchers would retaliate against them by not giving them good runs in the future. Moreover, because the number of runs available was limited, many drivers testified that they rarely turned down runs when offered. Therefore, knowing which runs are profitable has little impact on the drivers' ability to realize profit.